SOUTHERN RAILWAY COMPANY v. FRANCES J. MAYS, ADM'X, ETC.

# Richmond

March 12, 1951.

Record No. 3742.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*S. H. Williams, Joseph E. Blackburn, Thomas B. Gay, Lewis F. Powell, Jr.* and *H. Merrill Pasco,* for the plaintiff in error.

*William M. McClenny* and *L. H. Shrader,* for the defendant in error.

MILLER, J., delivered the opinion of the court.

In this action brought under the Federal Employer's Liability Act, Frances J. Mays, administratrix of Moses A. Mays, deceased, obtained a verdict and judgment against the Southern Railway Company for the alleged negligent killing of decedent.

The parties will be referred to as plaintiff and defendant in accordance with their positions in the court below.

Plaintiff occupies that favored status of having obtained a jury's verdict that has been approved by the trial court. If there were conflicts in the evidence, the jury resolved them in her favor and she is entitled to all just inferences deducible therefrom.

Decedent, an employee of the defendant, a common carrier engaged in interstate commerce, was killed while in the performance of his duties.

Under the Federal Employer's Liability Act, 45 U. S. C. A., sections 51 *et seq.,* defendant is liable if an employee's death is caused in whole or in part by its negligence. Whether or not it was guilty of any negligence which caused or efficiently contributed to decedent's death is the sole issue to be decided. Determination of that question requires that the facts leading up to and surrounding the tragedy be set out in detail.

Mays was killed about 2:30 o'clock a. m., October 5, 1948. He was 56 years old and had been employed by defendant for about nine years as a section laborer. He was struck by the right end of the pilot beam on the engine of defendant's passenger train No. 42, which was then running about fifty miles per hour. The accident happened at Acme siding which is a part of the section of the road where decedent had worked for years and with which he was thoroughly familiar. At the location defendant's right of way extends in a northerly and southerly direction, and upon it three tracks are maintained which are about nine feet apart. The most westerly track is the southbound main line; next toward the east is the northbound main line and the most easterly of the three is a passing track. At this point there is a straight fill more than one thousand feet long. At each end of this embankment the tracks enter a cut in the terrain. At the center of the fill a culvert passes under the tracks and mile post No. 156

is located slightly north of the culvert. In some way this drain became clogged or stopped, and due to heavy rains, water accumulated on the west side of the fill. The water thus impounded had softened the west side of the fill at or near the culvert, which, in turn, caused that side of the roadbed to become defective and imperiled the southbound track.

Foreman W. E. Farish and a crew of section laborers, including decedent, spent most of August 4th repairing the defect at the culvert. As a precautionary measure, the track supervisor instructed Farish to secure one other man and for the two of them to keep watch at this defective spot throughout the night.

When the services of an employee are needed for extra work of this nature he is paid for time and a half. The senior employee in point of service is customarily extended the privilege of undertaking this extra work at the increased rate of pay. Though this opportunity is offered him, there is no obligation to accept. He may decline the extra service without incurring unfavorable results and it is then offered to the next senior workman in point of service and so on until accepted.

Decedent enjoyed seniority in this respect and was extended the opportunity by his foreman, Farish, of watching with him that night. The offer was accepted and they went to their homes for supper and decedent was informed by Farish that he would call by for him later and they would return to the defective spot on the roadbed.

Decedent's widow testified that when Farish stopped by their home after supper to take her husband back to the place where they were to watch, decedent was reluctant to go. She says that he then told Farish, "You go ahead, I don't believe I will work tonight", and Farish replied, "I am not going over in that hollow by myself." However, Farish testified that decedent did not decline to go and if any such remark were made, he did not so understand it. Anyhow, when Farish arrived at decedent's home, the latter had his dinner bucket ready and accompanied him to the defective place on the fill. It thus appears that he voluntarily accepted the assignment and acted under no order or compulsion.

It was about 6:00 o'clock p. m. when the two men arrived where they were to maintain their watch. They thus had full opportunity to see the condition of the surface of the roadbeds, and the entire area where they were to keep their vigil. The evening passed without untoward event. Though both men

carried flashlights, they thought it best to build a fire so as to have more light and thus be better able to observe the general condition obtaining on the premises. Before night came on, a spot for building the fire was agreed upon. At the suggestion of decedent, the spot selected was on the fill slightly south of mile post No. 156, to the east of the passing track and thus away from the main line tracks and passing trains.

No order as to the speed of northbound trains had been issued, but due to the soft spot over the culvert on the west side of the fill, southbound trains had been ordered to reduce speed to ten miles per hour at that point. It was decedent's duty to "keep watch over the soft place in the roadbed" and see that passing trains incurred no hazard. On the embankment west of the southbound track, there was about eight feet of area or shoulder before the fill dropped away. Thus sufficient space was afforded decedent to stand without danger on this embankment to the west of the southbound trains. Throughout the evening decedent kept watch at and over the defective place while these trains passed. The section foreman was with him at this spot when some of the trains passed and at other times the foreman was to the east of the tracks. Both men walked across the tracks to and from the fire and to each side of the fill from time to time. During the evening and night before the accident happened about twelve to fifteen trains passed, some of which were traveling north and some south, and decedent experienced no difficulty in seeing and hearing them.

The night is described as being dark, rainy, and foggy. However, it was quiet and still and approaching trains could be readily heard, and the fog was not of sufficient density to obscure the headlight of an approaching engine and such lights could be easily seen.

Some years ago decedent lost the sight of his left eye. Since that time he had used glasses but there was no suggestion or indication of impaired vision in his right eye. The evidence is that he was vigorous, alert and fully capable of seeing and hearing and that he satisfactorily performed all the labor and work incident to his duties as a section hand. As an experienced track laborer he was aware of defendant's rule which required track men to keep on the lookout for trains and when aware of one's approach to clear all tracks until it passed. Under this rule it is a track man's duty to be on the alert and look out for approaching trains and he may not rely upon others to perform

this duty for him though it was customary for them to warn each other when a train approached.

At 2:10 o'clock a.m., which was about twenty minutes before the accident, Foreman Farish was seated on the east end of a tie of the passing track eating his lunch. He was about twenty feet south of and with his back toward the fire. Decedent was at his post of duty on the west side of the fill. Farish says that decedent then called to him and said: "He told me he was going down the track and see the washout, been telling me I was going to see a man walk up there with his head off, told me I was going to see him that night." (This washout was about 1200 feet north of mile post No. 156 where there had been a slide on the edge of the cut, but that had been repaired and was of no further concern.) The foreman took this odd remark to have been made in jest. Yet it was the last statement made by decedent for he then proceeded up the west side of the fill towards the washout and passed out of sight.

Sometime later Farish saw the headlight of a northbound train. He paid no particular attention until it had passed but he then noticed the train slow down and stop. That prompted him to think something might be wrong and he went to the defective spot across the tracks. Upon observing that nothing was changed, he then crossed the tracks to the east side and started walking toward the standing train. At a spot which he estimated to be about fifty feet north of where he had been sitting, or about thirty feet north of the fire and a few feet beyond mile post No. 156, he came upon the body of decedent lying between the passing and northbound tracks. Blood on the western end of the ties of the passing track and marks in the gravel and ballast between the tracks indicated that Mays had been struck some distance south of where his body rested.

The only witness to the tragedy and the movements of decedent at the moment of the collision was J. L. Spigner, engineer of train No. 42. His account of what then happened is uncontradicted. He testified that the atmosphere was foggy with a "little smoke coming from this fire, across there"; he was keeping a lookout with the engine headlight burning and the train was not drifting but the engine was "working steam." He further said as he reached the point of the tragedy and just as the engine was "right on him" he saw a man down level with the pilot beam "in a ghost form, in a jump against the engine, in the air with his head down and hands out in front of him, like that",

.

and "When I seen him looked like he had jumped off the edge of the ties of the passing track, jumping west right toward the engine."

This view of decedent was momentary and fleeting. His body passed instantly out of view. The train was promptly stopped and upon examination evidence of contact with decedent's body was found on the pilot beam and the step brace that hangs under the right end of the beam. No other train was passing when the mishap occurred, nor had any train going in either direction passed that point for some time prior to the accident. There was a southbound train due at about that time but it did not arrive until a few minutes after No. 42 had stopped approximately one thousand feet north of the body. Therefore, no other train could have confused decedent and caused his unusual conduct.

Plaintiff asserts that upon these facts the jury was entitled to find that defendant was negligent and that such negligence, in part, efficiently caused the collision and resultant death. It is specifically pointed out that decedent was handicapped by the loss of an eye and asserted that defendant did not provide him a safe place in which to work. Under these circumstances, it is claimed that he was subjected to unusual risk and hazard in the performance of his assigned duties. Our attention is directed to the 1939 amendment of the Federal Employer's Liability Act, 45 U. S. C. A. sec. 54, wherein it is provided that "an employee shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." We are then reminded that the Supreme Court of the United States in construing this amendment in *Tiller* v. *Atlantic Coast Line R. Co.*, 318 U. S. 54, 58, 63 S. Ct. 444, 87 L. ed. 610, said: "We hold that every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment * * *."

We are therefore only called upon to determine whether or not defendant has been negligent and if so, was that negligence a proximate cause of decedent's death.

No liability may be imposed upon the carrier unless the evidence discloses (1) that it failed to exercise due care under the circumstances, and (2) that such negligence in part proximately caused the death. Otherwise stated, if defendant furnished decedent a reasonably safe place at which to perform his

work (and was not otherwise negligent), or if his death was wholly occasioned by a reckless and unforseeable act on his part not causally connected with any negligence on defendant's part, then no liability attached.

■ Under the Federal Employer's Liability Act, there is no assumption by an employee of risk due to negligence of any officer, agent or employee of the carrier. Nevertheless negligence on the part of defendant may not be presumed or inferred from mere proof of an accident.

"The right of action conferred * * * rests upon requisite proof of the employer's negligence as to the proximate cause of the employee's injury or death." *Fantini* v. *Reading Co.* (C. C. A. 3rd), 147 F. (2d) 543, cert. den. 325 U. S. 856, 65 S. Ct. 1185, 89 L. ed. 1976.

"Liability arises from negligence not from injury under this act." *Brady* v. *Southern Ry. Co.*, 320 U. S. 476, 64 S. Ct. 232, 88 L. ed. 239; *Trust Co.* v. *Erie R. Co.* (C. C. A. 7th), 165 F. (2d) 806, cert. den. 334 U. S. 845, 68 S. Ct. 1513, 92 L. ed. 1769.

■ At the location in question decedent's duty was to keep watch over the defective spot to the end that no danger would be incurred by passing trains. The rules of the company also required him to watch out for and avoid approaching trains. Under these circumstances in our opinion, there was no additional duty upon the carrier to keep a lookout for decedent or give warning to him of the approach of a train except what is required of the train crew in the exercise of reasonable care, and there is no proof that this was not done.

■ The place where this employee was assigned to work was upon the fill and in an area with which he was entirely familiar. The surface of the roadbed and fill was substantially level and in reasonably good condition for the performance of his duties. Over the tracks along the fill trains necessarily passed at intervals and of this fact and the danger from moving trains, decedent was fully aware. There was no unusual hazard in connection with the premises or place at which he was assigned to work; nor did the duties that he was to perform subject him to any risk not ordinarily incurred in the operation of a railroad. The risks and dangers to which he was subjected, such as they were, are inherent in and necessarily incident to the usual operations of the carrier. *Atlantic Coast Line R. Co.* v. *Coleman* (C. C. A. 5th), 182 F. (2d) 712; *Brady* v. *Southern Ry. Co.*,

*supra; Eckenrode* v. *Pennsylvania R. Co.* (C. C. A. 3rd), 164 F. (2d) 996, affirmed, per curiam, 335 U. S. 329, 69 S. Ct. 91, 93 L. ed. 41.

In his concurring opinion in *Tiller* v. *Atlantic Coast Line R. Co., supra,* Mr. Justice Frankfurter pertinently said:

"The basis of an action under the Act remains the carrier's negligence. The carrier is not to be relieved from the consequences of its negligence by any claim that the employee 'assumed the risk' of its negligence. But neither is the carrier to be charged with those injuries which result from the 'usual risks' incident to employment on railroads—risks which cannot be eliminated through the carrier's exercise of reasonable care." (318 U. S. at p. 72.)

■ J. S. Spigner's recital of the circumstances immediately surrounding the collision is a factual account of decedent's actions and conclusively establishes how he came in contact with the engine. It is unequivocal, direct and inclusive, and leaves no room or justification for inference as to what caused the accident. It definitely points out and conclusively establishes that decedent's reckless act was the cause and the only cause of his death.

■ There are no facts or circumstances proved or any inferences that may be drawn from those which are established that furnish any explanation of decedent's action. We know what he did was fraught with dire and certain disaster. From the evidence it only appears that he attempted to cross to the west side of the fill in front of the oncoming train and was struck. Why he elected not to wait the few seconds necessary for it to pass but recklessly undertook to cross at that instant does not appear and may not be inferred. The twilight field of conjecture and surmise as to why decedent acted so recklessly or what purpose or objective prompted him to thus expose himself to certain injury or death is unlimited. Yet neither this court nor the jury is permitted to mentally grope in that opaque realm of speculation in search of a reason not appearing from the proved facts and that cannot be justly inferred from the evidence. If we could, the proximate cause would still be his reckless act.

■ Nor was decedent's effort and attempt to cross the track in dangerous proximity to the oncoming train reasonably foreseeable by defendant. The rapidly approaching train could be readily seen and heard by him and his conduct and action were so unpredictable and self-destructive as not to be anticipated or

foreseeable in the exercise of reasonable care. Prevision of prophetic character may not be expected, nor is protection against such reckless conduct required. *Beamer* v. *Virginian Ry. Co.,* 181 Va. 650, 26 S. E. (2d) 43, cert. den. 321 U. S. 763, 64 S. Ct. 486, 88 L. ed. 1060; *Reynolds* v. *Atlantic Coast Line R. Co.,* 336 U. S. 207, 69 S. Ct. 507, 93 L. ed. 618.

Even though a carrier be negligent, if the injury or death is, as it was here proved to be, solely caused by the independent negligence of the party injured or killed, no liability ensues.

Strikingly apt is the statement in *Wolfe* v. *Henwood,* 162 F. (2d) 998, at p. 1001:

''But even if the evidence justified a finding of negligence (which it does not), there was a total failure to establish that negligence of defendant was 'in whole or in part' the cause of the injury. The plain fact is Wolfe sustained fatal injuries as a direct result of his own affirmative and voluntary act in lighting a match while he was soaked with a mixture of gasoline and fuel oil and in attempting to extinguish the flame by slapping his glove on his trousers. Plaintiff argues that Wolfe was an uneducated colored laborer who could not be held to a high standard of care, but that fact cannot create liability in defendant. We hold that the evidence established as a matter of law that Wolfe's negligent act was the sole cause of the accident.''

We conclude that plaintiff has failed to establish any negligence on the part of defendant that caused the accident. On the contrary, it conclusively appears from the evidence that his death was solely caused by his independent, inexplicable and reckless act.

*Reversed and final judgment.*