## CIRCUIT COURT OF WARREN COUNTY

Lois Eileene Johnson

v.

Ann M. Shaffer,
personal representative
of the estate of
Billy G. Dowdy, Sr.,

Case No (Law) 93–22

BY JUDGE JOHN E. WETSEL, JR.

October 13, 1993

This case came before the Court on Shaffer's Demurrer to the Motion for Judgment, Plea of the Statute of Frauds, and Motions for Joinder of Third Parties; and First Federal Savings Bank's Motion to sever counterclaim and demurrers to the counterclaim. The original

Motion for Judgment was an action in detinue for the recovery of certain personal property and the counterclaim adds additional parties and asserts a cause of action against the Plaintiff and others unrelated to the matters set forth in the original Motion for Judgment.

## I. *Statement of Material Proceedings*

The Plaintiff Johnson is the former wife of Billy G. Dowdy. Johnson and Dowdy were divorced by decree of the Circuit Court of the City of Alexandria on March 17, 1986.

On October 4, 1985, Johnson and Dowdy entered into a property and support settlement agreement which is attached to the amended counterclaim as Exhibit 3 and which was incorporated into the final divorce decree between Johnson and Dowdy.

The separation agreement provided that the Northumberland County property owned by Johnson and Dowdy was to be listed and sold and specified the distribution of the sale proceeds.

Schedule A of the separation agreement provided as follows:

> Husband agrees to buy Wife's 1985 Pontiac Sunbird; Husband to make all car payments including taxes and insurance on said car until January 1, 1986, at which time Wife agrees to take over payments and all other related expenses including taxes and insurance. Husband agrees to sign title of said car over to Wife upon execution of this agreement.

> Husband to receive the 1981 Cadillac El Dorado; Husband to make all payments on said car including taxes and insurance. Wife agrees to sign over title to 1981 Cadillac El Dorado upon Husband signing title of 1985 Pontiac Sunbird over to Wife. Husband to take all tax deductions relating to both the 1981 Cadillac El Dorado and the 1985 Pontiac Sunbird.

While Johnson and Dowdy were alive, they never executed the title transfers to the Sunbird or the Cadillac nor did they sell the Northumberland County land.

Billy G. Dowdy died November 12, 1991, and on November 18, 1991, Ann Shaffer qualified as administratrix of his estate.

On November 18, 1991, Plaintiff Johnson had the Division of Motor Vehicles transfer the title to the Sunbird to her.

The estate of Dowdy has demanded that Johnson convey the Cadillac to the estate, but Johnson has refused.

Billy G. Dowdy's heirs-at-law are his three children, Billy G. Dowdy, Jr., Donna W. Ramos, and Ann M. Shaffer.

At some point after Johnson and Dowdy were divorced, Johnson returned to Dowdy's residence in Warren County and resided with him. The conditions under which Johnson returned to live with Dowdy and the length of time that she resided with Dowdy prior to his death are disputed.

Johnson was an employee of the First Federal Savings Bank of Shenandoah Valley, Front Royal, Virginia, in 1991.

In June 1991, a savings/checking account was opened at Front Royal First Federal Savings Bank in the name of Billy G. Dowdy.

The savings/checking account was a survivorship account and the payable on death portion of the contract, which is attached as Exhibit 6 to the amended counterclaim, named Johnson as the beneficiary on death.

After the account was opened, various sums were deposited into it by or on behalf of Dowdy, and at the time of his death the balance in the account was $5,579.33.

On November 27, 1991, the bank paid Johnson the balance of the account, which Shaffer claims for Dowdy's estate.

The original Motion for Judgment in this case filed by Johnson against Shaffer, administratrix, is a detinue action seeking the recovery of specific items of personal property which Johnson says belongs to her, and which Shaffer as administratrix claims belongs to the estate of Billy G. Dowdy.

Shaffer, administratrix, has filed a counterclaim against Johnson by which she seeks to obtain an accounting of the Sunbird payments made by Johnson after January 1, 1986, transfer of the 1981 Cadillac El Dorado or its reasonable value to the estate and sale by partition of the Northumberland County land.

Shaffer, administratrix, has also filed a counterclaim, which is technically a third party motion for judgment as to the Bank, against Johnson and First Federal Savings Bank of Shenandoah Valley based on alleged breach of contract and fraud arising from the creation of the Dowdy savings/checking account and its naming of Johnson as the death beneficiary in June 1991, and the subsequent deposits into that account.

## II. *Conclusions of Law*

### 1. *Demurrers*

In considering a demurrer the Court must apply "the settled rule that a demurrer admits the truth of all well-pleaded material facts. All reasonable inferences fairly and justly drawn from the facts alleged must be considered in aid of the pleading." *Russo v. White*, 241 Va. 23, 24, 400 S.E.2d 160 (1991), quoting *Fox v. Custis*, 236 Va. 69, 71, 372 S.E.2d 373 (1988). These principles were applied to the Court's ruling on the Demurrers.

### 2. *Shaffer's Plea in Bar and Plea of the Statute of Frauds*

The Motion for Judgment filed against Shaffer alleges the property in question belongs to the Plaintiff, and, assuming those averments are proven to be true, then Defendant Shaffer's Plea in Bar and Plea of the Statute of Frauds have no basis in law. The precise extent to which Virginia Code § 64.1–59 may apply to the facts cannot be determined at this time.

### 3. *Motion to Permit Joinder of Third Parties*

Defendant Shaffer's motions to add Billy G. Dowdy, Jr., Donna W. Ramos, and Ann M. Shaffer, and First Federal Savings Bank of Shenandoah Valley as Defendants to her counterclaim shall be granted.

### 4. *Bank's Demurrer to Count 1 (Contract) of the Counterclaim*

"The ideal result that legal draftsmen seek to attain and that judicial interpreters commonly seek to find in a written contract is that a judge should be able, by reading the contract without lifting his eyes from the page, to determine its one and only 'true' meaning in relation to the issues being litigated. Once this 'true' meaning has been ascertained, no other evidence should be permitted to fritter away the meaning and thus make written contracts unreliable." Patterson, *The Interpretation and Construction of Contracts*, 64 Colum. L. Rev. 833–855 (1964).

The Supreme Court of Virginia has long followed the plain meaning rule in cases of contract construction, and recent cases indicate that there is no trend toward relaxation of that rule. *See W. C. English, Inc. v. Commonwealth of Virginia*, 14 Va. App. 951, 953, 420 S.E.2d 252 (1992); and *Clinch Valley Physicians v. Garcia*, 243 Va. 286, 414 S.E.2d 599 (1992). In *Graphic Arts Mutual Ins. Co. v. C. W. Warthen*

*Co.*, 240 Va. 457–459, 460, 397 S.E.2d 876 (1990), the Supreme stated:

> Familiar principles of contract interpretation guide our consideration of this issue. "An insurance policy is a contract, and, as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction." *Hill v. State Farm Mutual Auto. Ins.*, 237 Va. 148, 152, 375 S.E.2d 727, 729 (1989). Additionally, in the absence of an ambiguity, which the trial court correctly concluded did not exist in this case, we must interpret the contract by examining the language explicitly contained therein. "Where an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Globe Company v. Bank of Boston*, 205 Va. 841, 848, 140 S.E.2d 629, 633 (1965) (citations omitted) . . . .
>
> It is the function of the court to construe the contract made by the parties, not to make a contract for them. The question for the court is what did the parties agree to as evidenced by their contract. The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares.

*Magann Corp. v. Electrical Works*, 203 Va. 259, 264, 123 S.E.2d 377, 381 (1962) (citations omitted).

The savings accounts/checking account contract, Exhibit 6, is attached to the counterclaim, and it is clear and unambiguous. If it was not fraudulently induced, the bank has paid this account to Johnson pursuant to its express provisions. The Amended Counterclaim fails to state a breach of contract claim against the bank. Dowdy was not an intended third party beneficiary of the rules and regulations of the Bank, which are claimed to have been breached. *See* Va. Code § 55–22. As noted by the Supreme Court of Virginia in *Cobert v. Homeowner's Warranty Corp.*, 239 Va. 460, 466, 391 S.E.2d 263 (1990), quoting with approval *Copenhaver v. Rogers*, 238 Va. 361, 384 S.E.2d 593 (1989):

> In order to proceed on the third-party beneficiary contract theory, the party claiming the benefit must show that the par-

ties to a contract "clearly and definitely intended" to confer a benefit upon him. Thus, Va. Code § 55–22 has no application unless the party against whom liability is asserted has assumed an obligation for the benefit of a third party. Put another way, a party who benefits only incidentally from a contract between others cannot sue thereon. The essence of a third-party's beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party but one of the parties to the agreement fails to uphold his position of the bargain.

Dowdy was only incidentally benefitted by virtue of any rules and regulations of the Bank as alleged in the Amended Counterclaim.

### 5. Bank's Demurrer to Count 2 (Fraud Count) of the Counterclaim

#### a. Elements of Fraud

In *Bryant v. Peckinpaugh*, 241 Va. 172, 175–176, 400 S.E.2d 201 (1991), the Supreme reviewed the elements of a viable fraud action:

A litigant who prosecutes a cause of action for actual fraud must prove by clear and convincing evidence: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. *Winn v. Aleda Construction Co.*, 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984). *See also Wolford v. Williams*, 195 Va. 489, 498, 78 S.E.2d 660, 665 (1953); *Ashby v. Red Jacket Coal Corp.*, 185 Va. 202, 207, 38 S.E.2d 436, 439 (1946); *Chandler v. Satchell*, 160 Va. 160, 171–72, 168 S.E. 744, 748 (1933); *Moore v. Gregory*, 146 Va. 504, 523, 131 S.E. 692, 697 (1925) . . . .

We said in *Greenbrier Farms v. Clark*, 193 Va. 891, 894, 71 S.E.2d 167, 169 (1952): "The object of a motion for judgment . . . is to set forth the facts which constitute the cause of action so that they may be understood by the defendant who is to answer them, by the jury who are to ascertain whether such facts exist, and by the court which is to give judgment."

The Amended Counterclaim alleges that "[t]he entry of Johnson's name as beneficiary on the 'Payable on Death Account' card was done [by Johnson] without the knowledge or consent of B. G. Dowdy, Sr." It is also claimed that the bank knew of this fact and ratified it. These

along with the other averments in Count 2 of Count II of the Amended Counterclaim state a cause of action for fraud against both Johnson and the Bank.

b. *Vicarious Liability for Fraud*

The innocent principal may be held liable for the fraud of his agent. In *Nationwide Ins. Co. v. Patterson*, 229 Va. 627, 632, 331 S.E.2d 490 (1985), the rule is stated:

> With regard to the second main issue, Nationwide argues that it is an innocent principal and cannot be held responsible for Huffman's misrepresentation. We cannot accept this contention. Nationwide argues that only by its direct participation can it be held liable for its agents' conduct. We have long adhered to the rule that "a principal is bound by representations of his agent, made either in the scope of his employment or in furtherance of the object for which he is employed." *Cerriglio v. Pettit*, 113 Va. at 542, 75 S.E. at 307. In *Jefferson Stand. Ins. Co.*, we explained that the rule is one of public policy and convenience; we said that "in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through instrumentality of agents. In every such case, the principal holds out his agent, as competent, and fit to be trusted; and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency." 181 Va. at 834, 27 S.E.2d at 202 (quoting J. Story, *Commentaries on the Law of Agency*, § 452 (9th ed. 1882)). We reaffirmed our view on this subject in *Dudley*.

c. *Vicarious Liability for Punitive Damages*

The general rule governing vicarious liability for punitive damages arising from the act of one's employee or agent is set forth in 22 Am. Jur. 2d, *Damages*, § 785:

> Exemplary damages (punitive damages) can be awarded only against one who has participated in the wrongful act, and usually are not given against those liable, if at all, merely by reason of their relation to the wrongdoer. Since punitive damages are awarded primarily to punish the offender and discourage similar offenses, these justifications for their imposition

are sharply diminished if vicarious liability were recognized. However, there are exceptions to the above rule dealing with liability of employers and principals for the acts of their agents, . . . .

In 22 Am. Jur. 2d, *Damages*, § 786, discusses an employer's liability for acts of his employees:

According to the Restatement of Torts, 2d, punitive damages can properly be awarded against a master or other principal because of an act by an agent, if and only if (a) the principal or a managerial agent authorized the doing and the manner of the act, (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or managerial agent of the principal ratify or approve the act.

In *Virginia Ry. & P. Co. v. Deaton*, 147 Va. 576, 582, 137 S.E. 500 (1927), held:

It has been uniformly held by this court that a master is liable, to the extent of actual or compensatory damages, for the unlawful act of an agent committed in the course of his employment, whether the act be ratified or not; but, in order to recover exemplary or punitive damages, the burden is on the plaintiff to show that such act was either previously authorized or subsequently ratified.

*See also Jordan v. Suave*, 219 Va. 448, 247 S.E.2d 739 (1978) (car dealership knew of fraud of salesman so punitive damages were potentially recoverable); *Wallen v. Allen*, 231 Va. 289, 297, 343 S.E.2d 73 (1986) (employer not liable because he failed to ascertain that a prospective employee lacked the proper chauffeurs' license to operate a truck where he was later involved in an accident); *Oberbroeckling v. Lyle*, 234 Va. 388, 373 S.E.2d 688 (1987) (corporation may be liable for punitive damages if the agent's alleged defamatory statement was authorized or subsequently ratified by the principal); and *Agyeman v. Pierce*, 26 Va. Cir. 140 (Richmond 1991) (sheriff not liable for punitive damages for excessive force of deputy making arrest).

The gist of Shafer's fraud claim against the Bank is that Johnson violated the bank's rules and regulations incident to the creation of the

account and its later payment to Johnson, and that Johnson fraudulently converted Dowdy's account. Since the averments state that the bank knew of this and ratified Johnson's actions, Amended Counterclaim, Count 2, paragraph 11, a fraud action has been stated against the bank for both compensatory damages and for punitive damages.

## 6. *Bank's Motion to Sever Counterclaim*

The facts alleged in the counterclaim by Shaffer against Johnson and the bank based on the savings/checking account do not arise from the cause of action alleged in the Motion for Judgment, and it would confuse the jury to try the fraud counterclaim against Johnson and the bank in the same action as the Plaintiff's detinue action against Shafer. Accordingly, the motion of the bank to sever the counterclaim filed by Johnson against the Bank and Johnson should be granted.

## III. *Decision*

For the foregoing reasons it is adjudged and ordered that:

1. Shaffer's Demurrer to the Motion for Judgment is denied.

2. Shaffer's Plea in Bar and Plea of the Statute of Frauds are denied.

3. Shaffer's Motion to Join Billy G. Dowdy, Jr., Donna W. Ramos, and Ann M. Shaffer, and First Federal Savings Bank of Shenandoah Valley as Third Party Defendants is granted.

4. Shaffer's Motion to Transfer the Sale of the Northumberland County property to the equity docket of this Court is granted, and an appropriate order transferring that right of action to the equity docket of the court and granting partition shall be prepared by counsel for Shaffer, administratrix, endorsed by counsel for the other parties and forwarded to the Court for entry. Counsel for Shaffer and Counsel for Johnson are appointed special commissioners for the purposes of said sale. The property shall be listed with a realtor for private sale subject to court approval until March 31, 1994, and, if the property is not then under contract, it shall be advertised and sold at public auction.

5. First Federal Savings Bank's Demurrer to Count 1 of Shaffer's counterclaim filed against it, the contract claim, is granted.

6. First Federal Savings Bank's Demurrer to Count 2, the fraud and constructive fraud count of the counterclaim, is denied.

7. The motion of First Federal Savings Bank to sever the counterclaim of Shaffer, administratrix, against Johnson and the bank is granted.

8. Count 1 of the Counterclaim against Johnson based on the Sunbird and Cadillac provisions of the Property Settlement agreement between Dowdy and Johnson shall be tried with the Plaintiff's detinue action.

## May 19, 1994

This case was tried before a jury on March 9 through 11, 1994. The jury returned with a verdict against Lois in the amount of $5,579.33 for compensatory damages against the Defendants Johnson and First Federal Savings Bank and $5,000 for punitive damages against Defendant Johnson only. Defendants have moved to set aside the verdict, and the parties filed memoranda of law, and appeared before the Court on May 6, 1994, and argued their positions, which have been considered, and the Defendants' Motions to Set Aside the Jury Verdict are granted for the reasons herein stated. Technically speaking, Shaffer was a counter-claimant, but she is referred to in this decision as the plaintiff and Johnson, who was the plaintiff in the action from which Shaffer's counterclaim arose, is referred to as the Defendant along with the bank.

### I. *Statement of Facts*

The following facts are stated in the light most favorable to the Plaintiffs.

Lois Johnson is the second wife of Billy Dowdy. Johnson and Dowdy were divorced on March 17, 1986. Shaffer is the administrator of Dowdy's estate, and Dowdy's daughter by his first marriage.

Some time after their divorce, Johnson returned to Dowdy's residence in Warren County, Virginia, to live with him. Johnson and Dowdy again separated for a time, but in February 1991, Johnson again returned to live with Dowdy. Jimmy Riffle, Johnson's adult son also lived with Dowdy and Johnson until September 1991, when he and Johnson moved out of the Dowdy residence.

The arrangement under which Dowdy and Johnson lived together was described by Johnson as "platonic." Inferences could be drawn that there was also a physical relationship, and, according to some of the Plaintiff's evidence, it could also be inferred that the relationship was strained at the time that the account at First Federal was opened. Regardless of what the relationship was in June 1991, Johnson and Dowdy separated again in September 1991.

After their divorce, Dowdy and Johnson had a bank account on which Johnson was named as survivor at the Front Royal Credit Union, which was closed in March 1991, a month after Johnson returned again to live with Dowdy.

In the summer of 1991, Billy Dowdy was self employed as a contractor as he had been for years. Dowdy had several employees including one of Johnson's adult sons, Mike Riffle, who continued to work for Dowdy after Johnson moved out in September 1991. In the summer of 1991, Dowdy had no history of heart disease and appeared to be in good health, however, Dowdy died suddenly on November 12, 1991. There was no evidence that this was expected by anyone.

Johnson became an employee of the Defendant First Federal Savings Bank in May 1991. Johnson's employment was at all times in the loan department of First Federal Bank.

On June 13, 1991, an account was opened at First Federal's Front Royal branch in the name of Dowdy by Lois Johnson. Johnson opened the account with one dollar, and thereafter Dowdy deposited money in the account at various times. Mary Ann Lang was the account clerk who processed the account for Dowdy at First Federal Savings Bank at Johnson's request.

The bank account created in June 1991 was a survivorship account, and the payable on death portion of the contract of deposit named Johnson as the beneficiary of the account in the event of Dowdy's death. While named as the death beneficiary on the account, Johnson was not authorized to write checks on the account.

According to bank employee Lang, Johnson filled in her own name in her own handwriting on the payable on death card prior to the card being taken from the bank. Johnson testified in contradiction to Lang that she got the signature cards from Stacey McLendon, another bank employee, which McLendon did not recall, and that Johnson filled her name in on the beneficiary portion of the card, not at the time that the card was taken from First Federal, but rather immediately before Dowdy signed the card at the kitchen table in their home. Taking the cards home to be signed was a departure from the Bank's established procedures. The plaintiff's evidence on the opening of the account is set forth in detail in paragraph 4 of her statement of facts in her memorandum in opposition to the motions to set aside the verdict.

The Plaintiff called Johnson as an adverse witness, and Johnson testified in the plaintiff's case in chief with respect to the manner in

which the account was opened, how Dowdy signed the cards, Dowdy's instructions and intentions with respect to the account, and that she complied with Dowdy's wishes in opening the account in the manner in which she did. Johnson said they after she returned in February 1991, that she and Dowdy got along well. She said that Dowdy was the one who wanted to open an account at First Federal and that it was Dowdy's idea to make her the payable at death beneficiary on the account. The Plaintiff did not claim that Dowdy could not read, nor did the Plaintiff challenge the validity of Dowdy's signatures on the account cards.

After the account was opened, various sums were deposited into it by or on behalf of Dowdy with one withdrawal from the account. After Johnson left in September 1991, Dowdy continued to use the account. At the time of his death, the balance in the account was $5,579.33, which is the amount for which the jury awarded compensatory damages against both Johnson and the Bank.

Leroy Shaffer, one of Dowdy's sons-in-law, said that he was present when Johnson moved out of Dowdy's residence in September 1991, and that Dowdy told Johnson to take only what was hers and that Dowdy seemed relieved when Johnson left.

Dowdy's step son-in-law, Dennis Gorton, testified that he had a conversation with Dowdy in October 1991 in which Dowdy said that he had taken steps to see to it that Johnson never got anything more from him.

Mike Riffle, Johnson's son, continued to work for Dowdy after his brother and mother moved out of Dowdy's residence. He and Dowdy rode to work together, and Mike Riffle stayed in Dowdy's residence two to three nights a week during September and October, 1991. Mike Riffle was with Dowdy when Dowdy went to First Federal on several occasions during the period in question, but Dowdy and Riffle never discussed the specifics of the First Federal account.

When Dowdy had his heart attack, Mike Riffle was the one who took him to the hospital. Dowdy was admitted to Winchester Memorial Hospital, and there Johnson asked Dowdy to agree to execute a power-of-attorney giving her the right to control his affairs.

## II. *Conclusions of Law*

In *Fobbs v. Webb Building Limited Partnership*, 232 Va. 227, 229–230, 349 S.E.2d 355, 357 (1986), the Supreme Court stated the

standards by which a jury verdict is to be reviewed in considering a motion to set aside a jury verdict:

> A trial court may set aside a jury verdict and enter final judgment only when the verdict is plainly wrong or without credible evidence to support it. A jury weighs the testimony of witnesses and resolves conflicting evidence. If reasonable minds can differ in the conclusions of fact to be drawn from the evidence, a jury is the proper tribunal to draw the conclusion. A trial judge cannot substitute his conclusion for that of a jury merely because he would have voted differently had he been on the jury. *Coleman v. Blankenship Oil Corp.*, 221 Va. 124, 128–29, 267 S.E.2d 143, 146 (1980); *Commonwealth v. McNeely*, 204 Va. 218, 222, 129 S.E.2d 687, 689–90 (1963).

As the Supreme Court observed in *Virginia and Maryland R.R. Co. v. White*, 228 Va. 140, 145, 319 S.E.2d 755 (1984) (quoting *Bly v. Southern Ry. Co.*, 183 Va. 162, 175, 31 S.E.2d 564 (1944)):

> It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. *The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable . . . .* That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable (emphasis added).

These are the standards which the Court applied in assessing the evidence in this case, which was not sufficient as a matter of law to support the plaintiff's verdict.

In the case of *Kensington Associates v. West*, 234 Va. 430, 362 S.E.2d 900 (1987), Defendant employer had hired a security guard to patrol a construction site, and the security guard, while on duty, engaged in horseplay with another employee and accidentally shot that employee. The Supreme Court reversed the plaintiff's judgment against the Employer, and, in so ruling, stated at 432–433:

Under the doctrine of respondeat superior, an employer is liable for the tortious act of his employee if the employee was performing his employer's business and acting within the scope of his employment. *McNeill v. Spindler*, 191 Va. 685, 694, 62 S.E.2d 13, 17 (1950). Generally, an act is within the scope of the employment if (1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed, although mistakenly or ill-advisedly, with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business, "and did not arise wholly from some external, independent, and personal motive on the part of the [employee] to do the act upon his own account." *Broaddus v. Standard Drug Co.*, 211 Va. 645, 653, 179 S.E.2d 497, 503–04 (1971); *Cary v. Hotel Rueger, Inc.*, 195 Va. 980, 984, 81 S.E.2d 421, 423 (1954); *Tri-State Coach Corp. v. Walsh*, 188 Va. 299, 307, 49 S.E.2d 363, 367 (1948); *Davis v. Merrill*, 133 Va. 69, 77, 112 S.E. 628, 630–31 (1922).

When an employer-employee relationship has been established, "the burden is on the [employer] to prove that the [employee] was not acting within the scope of his employment when he committed the act complained of, and . . . if the evidence leaves the question in doubt it becomes an issue to be determined by the jury." *Broaddus*, 211 Va. at 653–54, 179 S.E.2d at 504 (emphasis added); *Alvey v. Butchkavitz*, 196 Va. 447, 453, 84 S.E.2d 535, 539 (1954); *McNeill*, 191 Va. at 695, 62 S.E.2d at 18. *Accord Bivens v. Manhattan Car Corp.*, 156 Va. 483, 159 S.E. 395 (1931); *Crowell v. Duncan*, 145 Va. 489, 134 S.E. 576 (1926). Moreover, when the undisputed evidence shows that an employee's deviation from his employer's business is slight and not unusual, or, on the other hand, great and unusual, a court shall determine, as a matter of law, whether the employee was acting in the scope of his employment. When, however, the evidence places the case between these two extremes, the issue is for a jury. *E.g., Broaddus*, 211 Va. at 653–54, 179 S.E.2d at 504; *Alvey*, 196 Va. at 454, 84 S.E.2d at 539; *McNeill*, 191 Va. at 695, 62 S.E.2d at 18; *Bivens*, 156 Va. at 495, 159 S.E. at 399; *Drake v.*

*Laundry Corp.*, 135 Va. 354, 363–64, 116 S.E. 668, 671 (1923).

In the case at bar, when Johnson took the signature cards home to be signed by Dowdy, Johnson had clearly departed from the business of First Federal and was on an errand for Dowdy. She left First Federal taking the bank cards home. The only evidence was that she was doing this at the request of Dowdy and that is the only inference which can be drawn, as he clearly wanted the account to be opened because he kept it open after Johnson left. There is no evidence to the contrary nor any reasonable inference to rebut a contrary conclusion. Therefore, the Bank cannot be held liable for Johnson's acts under the theory of *respondeat superior.*

In *Kern v. J. L. Barksdale Furniture Corp.*, 224 Va. 682, 685, 299 S.E.2d 365 (1985), the Supreme Court ruled:

> One who deals with an agent does so at his own peril and has the duty of ascertaining the agent's authority. If the agent exceeds his authority, the principal is not bound by the agent's act. *Kern v. Freed Co.*, 224 Va. at 678, 299 S.E.2d at 364; *Seergy v. Morris Realty Corp.*, 138 Va. 572, 577, 121 S.E. 900, 902 (1924). However, the principal is bound, under the doctrine of apparent authority, to the extent he holds out another as having the authority to act for him. *Southern Amusement Co. v. Ferrell*, 125 Va. 429, 433, 99 S.E. 716, 717 (1919). This is true even if the agent commits a fraud. *Dudley v. Estate Life Ins. Co.*, 220 Va. 343, 347–51, 257 S.E.2d 871, 874–76 (1979).

*Dudley v. Estate Life Ins. Co.*, 220 Va. 343, 257 S.E.2d 871 (1979), is instructive. There the plaintiffs sued Blood, Estate's agent, for fraudulent inducement to sign insurance contracts. Estate Life gave Blood the title "Director-Special Marketing," business cards, and business literature, and through the guise of being Estate's agent, Blood was able to perpetuate the fraud. In ruling that Estate Life was vicariously liable for Blood's fraud, the Supreme Court stated:

> We are guided in our decision by the following Restatement rules, which are in accord with principles already established in Virginia:

### Agent's Position Enables Him to Deceive

A principal who puts a servant or other agent in a position which enables the agent, *while apparently acting within his authority,* to commit a fraud upon third persons is subject to liability to such third persons for the fraud.

Restatement (Second) of Agency § 261. Comment a to § 261 reads as follows:

The principal is subject to liability under the rule stated in this Section although he is entirely innocent, has received no benefit from the transaction, and, as stated in Section 262, although the agent acted solely for his own purposes. *Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.*

Section 262 of the same Restatement provides:

### Agent Acts for His Own Purposes

A person who otherwise would be liable to another for the misrepresentations of one *apparently acting for him* is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the other has notice of this.

The Comment gives the following rationale for the rule set forth in § 262.

A person relying upon the appearance of agency knows that the apparent agent is not authorized to act except for the benefit of the principal. This is something, however, which he normally cannot ascertain and something, therefore, for which it is rational to require the principal, rather than the other party, to bear the risk. The underlying principle based upon business expediency — the desire that third persons should be given reasonable protection in dealing with agents — finds expression in many rules, some in situations in which there is no apparent authority . . . and many in situations in which there is apparent authority . . . . In all of such cases the other party relies upon the honesty of the agent, and, if the principal is disclosed or partially disclosed, realizes that the agent is not

authorized if fraudulent. *It is, however, for the ultimate interest of persons employing agents, as well as for the benefit of the public, that persons dealing with agents should be able to rely upon apparently true statements by agents who are purporting to act and are apparently acting in the interests of the principal.*

Restatement (Second) of Agency § 262, Comment a.

The foregoing principles were applied in *Jefferson Standard Life Insurance Co. v. Hedrick*, 181 Va. 824, 27 S.E.2d 198 (1943). There, the willful and culpable deception by the agent, authorized by his employer, an insurer, to solicit loans for the company, induced the plaintiff not to seek a loan elsewhere resulting in damage to plaintiff for which he sued the principal. This court in affirming a judgment against the insurer, held that a principal is liable for the fraudulent and deceitful acts of his agent *"committed as an incident to and during the performance of an act which is within the scope of the agent's authority."* 181 Va. at 834–35, 27 S.E.2d at 202.

Review of several foreign cases will demonstrate the manner in which courts of other jurisdictions have applied the foregoing principles. In *Bowman v. Home Life Ins. Co.*, 243 F.2d 331 (3d Cir. 1957), a male field underwriter for defendant life insurer, masquerading as the company's physician, conducted intimate physical examinations upon the female plaintiffs, who had applied for insurance. The insurer furnished the underwriter with the plaintiffs' original application cards, which entitled him to ask plaintiffs many questions. He was to determine whether the insurance applied for was an appropriate risk for the company to assume. The underwriter was not a physician and he was not authorized to conduct physical examinations. He obtained a black bag, which looked like a physician's kit, called upon the plaintiffs at their home and made the examinations. Applying Pennsylvania law and the foregoing Restatement rules, the Third Circuit determined, in the plaintiffs' suit for damages against the insurer, that the underwriter's conduct could be attributed to his employer. The court noted that even though the agent went further than his instructions and committed a tort upon the plaintiffs, *"this was*

*a kind of deceit which was well within the insignia of office with which he had been clothed."* 243 F.2d at 334.

*Id.* at 349–351 (emphasis added).

The distinction between *Dudley* and *Bowman, supra,* and the case at bar is obvious, in each of those cases the unscrupulous agent used his indicia of authority provided him by his employer to gain access to the victim and then to gain the victim's confidence in a transaction in which it appeared that the agent was acting for his employer in the regular course of the employer's business, but in reality was engaged in self dealing. It was Johnson's close, personal relationship with Dowdy which got her into his house and into his confidence. The evidence is uncontradicted that Dowdy wanted to open the bank account and asked Johnson to get the necessary documents. As noted in the comment to § 362 of Restatement (Second) Agency, the justification for the rule is that the innocent third party cannot reasonably be expected to ascertain the true extent of the agent's authority and is, therefore, entitled to rely upon the agent's representations. Both the indicia of apparent authority and the justification for the rule are absent in this case. There is no fact in evidence from which it can be reasonably inferred that the bank clothed Johnson with apparent authority which enabled her to perpetuate a fraud upon Dowdy. Therefore, the bank is not liable for any act which Johnson may have committed in the privacy of her home based on Johnson's apparent authority.

As stated in 17A Am. Jur. 2d, *Contracts,* § 225:

> Failure to read a contract before signing it will not, as a rule, affect its binding force. Indeed, the courts appear to be unanimous in holding that a person who, having the capacity and an opportunity to read a contract, is not misled as to its contents and who sustains no confidential relationship to the other party cannot avoid the contract on the ground of mistake if he signs it without reading it, at least in the absence of special circumstances excusing his failure to read it.

Of like effect is 37 Am. Jur. 2d, *Fraud and Deceit,* § 268:

> Generally, a party is bound by his signature to a contract, in the absence of fraud, whether he reads the contract or not. Mere ignorance of the contents of a written instrument does not ordinarily affect the liability of one who signs it, and relief

by way of cancellation of such instrument will, in such cases be denied.

The payable on death card is a clear and unambiguous contract between Dowdy and the bank. The evidence is uncontradicted that Dowdy signed the card, that Johnson's name was on the card when he signed it, and that it was his idea to name her as the death beneficiary.

"While fraud may be shown by circumstantial evidence, it must have a logical and substantial basis and cannot rest upon vague suspicion and surmise." *French v. Beville*, 191 Va. 842, 856, 62 S.E.2d 883 (1951). "Fraud is never presumed." *Midkiff v. Midkiff*, 201 Va. 829, 833, 113 S.E.2d 875 (1960); *accord Miller v. Miller*, ___ Va. App. ___ (1994). "Fraud or breach of trust ought not lightly to be imputed to the living; for the legal presumption is the other way . . . ." *New v. Harman Coal Corp.*, 181 Va. 627, 634, 26 S.E.2d 39 (1943) (quoting with approval *Prevost v. Gratz*, 19 U.S. 481, 5 L. Ed. 311 (1821)). In *Malbon v. Davis*, 185 Va. 748, 756, 40 S.E.2d 183 (1946), the Supreme Court reviewed several principles governing proof of fraud by circumstantial evidence and stated:

> In *Redwood v. Rogers*, 105 Va. 155, 158, 53 S.E. 6 (1906), this is said: "The charge of fraud is one easily made, and the burden is upon the party alleging it to establish its existence, not by doubtful and inconclusive evidence, but clearly and conclusively. Fraud cannot be presumed. It must be proved by clear and satisfactory evidence. It is true that fraud need not be proved by positive and direct evidence, but may be established by facts and circumstances sufficient to support the conclusion of fraud. But whether it be shown by direct and positive evidence, or established by circumstances, the proof must be clear and convincing, and such as to satisfy the conscience of the chancellor, who would be cautious not to lend too ready an ear to the charge." . . . .
>
> In *Hancock v. Anderson*, 160 Va. 225, 168 S.E. 458 (1933), this is said: "The presumption is that people who deal with each other, grown men and women, deal with each other as such, and this presumption is not destroyed by disparity in age nor by the ties of blood, and this is particularly true where a fraud is charged, either actual or constructive. *Moore v. Gregory*, 146 Va. 504, 131 S.E. 692 (1925)."

In *Hazelwood v. Forrer*, 94 Va. 703, 706–707, 27 S.E. 507 (1897), which the Plaintiff relies upon, the Supreme Court upheld the plaintiff's verdict setting aside a deed and quoted with approval *Parr v. Saunders*, 1 Va. Dec. 724, 11 S.E. 979 (1880):

> A transaction may, of itself and by itself, furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of the defendants, or even the evidence of witnesses. The circumstances attending and following a transaction are often of such character as to leave not even a shadow of a doubt as to the real object and motive of the parties engaged in it. *Id.* at 731.

The transactional facts of *Hazelwood* stand in stark contrast to those of the case at bar. *Hazelwood* was a suit to set aside a deed executed in fraud of creditors where an insolvent mother had conveyed her property to a dissolute son to protect her assets. In the case at bar the parties had known each other for years and had a pattern of separation followed by reconciliation. They had had joint accounts before and knew how to close them. Lastly, and perhaps most importantly, is the transaction itself. Johnson's interest in the survivorship account was conditional, so that, when the account was opened, it was very problematic as to whether she would ever receive anything from the account. Dowdy would have to keep the account open with a balance in it, and Johnson would have to survive Dowdy in order to receive any benefit from the account.

Fraud must be proven by clear and convincing evidence. In *Bryant v. Peckinpaugh*, 241 Va. 172, 175, 400 S.E.2d 201 (1991), the Supreme Court reviewed the elements of a viable fraud action:

> A litigant who prosecutes a cause of action for actual fraud must prove by clear and convincing evidence: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. *Winn v. Aleda Construction Co.*, 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984). *See also Wolford v. Williams*, 195 Va. 489, 498, 78 S.E.2d 660, 665 (1953); *Ashby v. Red Jacket Coal Corp.*, 185 Va. 202, 207, 38 S.E.2d 436, 439 (1946); *Chandler v. Satchell*, 160 Va. 160, 171–72, 168 S.E. 744, 748 (1933); *Moore v. Gregory*, 146 Va. 504, 523, 131 S.E. 692, 697 (1925). The

misrepresentation that Ackerman made to Peckinpaugh was: "[The tobacco allotment is] just a small amount; for these figures you don't need to add it in, it's insignificant." This purportedly false representation was not material. Mr. Peckinpaugh testified that he "had fallen in love with the farm, and all of the other things were insignificant. And the question was, the main thing was could I afford it [the farm]." Additionally, the Peckinpaughs failed to prove by clear and convincing evidence that they relied upon the misrepresentation. Accordingly, the trial court should have granted the motion to strike the Peckinpaughs' claim of fraud.

In *Bryant* the facts allegedly supporting the alleged fraud were much more incriminating and clearer than those of the case at bar, but they were not sufficient to support a claim of fraud, and that case illustrates the importance of every element of a viable fraud claim. *See also Bergmueller v. Minnick*, 238 Va. 332, 336–337, 383 S.E.2d 772 (1989).

In the case at bar, the equities of the case were presented, and an eloquent argument made, which played to the natural sympathy of the jury, that somehow Dowdy had been taken advantage of by Johnson. The crux of the Plaintiff's case was aptly characterized by Plaintiff's counsel in the oral argument in opposition to the motion to set aside, the fraudulent "scenarios are limited only by the imagination of the jury." Imagination and speculation are both hand maidens of fantasy, and neither is a proper basis for a jury verdict. The Plaintiff's evidence of fraud is not clear and convincing.

The extent to which inferences may be drawn from circumstantial evidence, and the extent to which inferences may be compounded or pyramided is a perplexing issue for courts, as they seek to define the boundary between permissible inference and impermissible speculation. *See generally* C. Friend, *The Law of Evidence in Virginia* §§ 10–1 and 10–3 (4th ed. 1993). In *Carter v. Lambert*, 246 Va. 309, 435 S.E.2d 404 (1993) (dissent), Chief Justice Carrico, discussing the effect of a conflict between direct evidence and an inference in an automobile negligence case, stated:

"Like presumptions, inferences are never allowed to stand against ascertained and established facts." *Ragland v. Rutledge*, 234 Va. 216, 219, 361 S.E.2d 133, 135 (1987). An inference that a plaintiff contends would impose liability upon

a defendant must give way to "positive, uncontradicted evidence" which exonerates the defendant from liability and which "demonstrates that the inference is based upon speculation and conjecture." *Id.* And, *where a plaintiff calls a defendant as an adverse witness, the plaintiff is bound by so much of the defendant's testimony that is clear, reasonable, and uncontradicted, and not in conflict with the evidence presented by the plaintiff. Weddle v. Draper*, 204 Va. 319, 322, 130 S.E.2d 462, 465 (1963) (emphasis added).

Similarly, in *Johnson v. Commonwealth*, 15 Va. App. 73, 422 S.E.2d 593 (1993) (dissent), Justice Benton writes:

In a lengthy, persuasive analysis of the sharp divergence between "the text writers on the one hand, and the Courts on the other," *New York Life Ins. Co. v. McNeely*, 79 P.2d 948, 954 (Ariz. 1938), the Supreme Court of Arizona observed:

After a careful examination of both the cases and the texts, we are of the opinion that the divergence is more in the form of stating the rule than the application thereof. As Dean Wigmore has frequently pointed out in his monumental work, the rules of evidence applied by the courts are not, and never have been, governed strictly by the principles of logic as taught and applied in the schools. These principles are frequently modified or even set aside on account of practical reasons, which experience shows should govern the trial of controverted issues in the courts. It is true, of course, that in everyday life, all men frequently act as the result of the repeated piling of inferences upon inferences, and, as a matter of strict logic, if an inference has any probative value whatever in aiding one to determine the ultimate question of fact, it should be considered. The principle which is applied by the average man in his own private affairs usually is that no matter how many inferences are piled on each other, it is only necessary that each successive inference should be more probable than any other which might be drawn under all the circumstances. The courts, however, have always insisted that the life, liberty and property of a citizen should not be taken away on possibilities, conjectures, or even, generally speaking, a bare probability. In criminal cases, they demand that when a conviction is to be

based on a chain of inferences, each and every link in that chain must exclude every other reasonable hypothesis. *In civil cases, involving only property rights, the rule is not so strict, and it is sufficient, if the ultimate fact is to be determined by an inference from facts which are established by direct evidence, that it be more probable than any other inference which could be drawn from the facts thus proven.* But when an inference of the probability of the ultimate fact must be drawn from facts whose existence is itself based only on an inference or a chain of inferences, it will be found that the courts have, with very few exceptions, held in substance, although usually not in terms, that all prior links in the chain of inferences must be shown with the same certainty as is required in criminal cases, in order to support a final inference of the probability of the ultimate fact in issue. We think that this is the true meaning of the *"inference upon inference" rule in civil cases is borne out by a careful analysis of the majority of cases in which it has been applied, and that the courts do not mean that under no circumstances may an inference be drawn from an inference, but rather that the prior inferences must be established to the exclusion of any other reasonable theory rather than merely by a probability, in order that the last inference of the probability of the ultimate fact may be based thereon. This rule is not based on an application of the exact rules of logic, but upon the pragmatic principle that a certain quantum of proof is arbitrarily required when the courts are asked to take away life, liberty or property.*

*Id.* at 954–55 (emphasis added).

The significance of these principles as applied to the fraud case against Johnson is that, since there is no direct evidence of the fraud, every inference supporting the fraud must be "clearly and convincingly" the inference to be selected from competing inferences. In the instant case, it is established by Johnson's direct testimony that Dowdy wanted to open an account, that he asked Johnson to bring the signature cards home, that when he signed the cards, they were completely filled out, and that he wanted Johnson to be the death beneficiary of the account. The evidence which the Plaintiff argues supported an inference that Dowdy did not know that he had signed an account card which made Johnson the death beneficiary on the First Federal account

is Dowdy's statement to Dennis Gorton, his son-in-law, in October 1991, that he had taken care of things so that Johnson would get nothing more from him; the fact that Johnson was contradicted about how she got the cards and where she inserted her name on the payable on death card; and the circumstances of their estrangement and separation in September, 1991. To reach a verdict of fraud in this case, the train of inferences would have to be as follows:

1. Dowdy meant what he said when he spoke to Gorton;

2. Dowdy meant that Johnson would never get anything while he was living or after his death;

3. Dowdy did not know about the payable on death card, as opposed to simply having forgotten about it;

4. The reason that Dowdy did not know about the payable on death card was because of some act of Johnson; and

5. The act of Johnson mislead Dowdy into signing the payable on death card contrary to his intentions.

While jurors are not required to apply Aristotelian syllogisms in their analysis of the evidence, there must be a discernible train of inferences logically drawn from the evidence to support their verdict. Where fraud is to be proven by circumstantial evidence, each inference drawn by the jury must "clearly and convincingly" be the inference to be selected from competing inferences. In this case, the train of inferences is just one of several equally probable conclusions to be drawn from the evidence.

In *Ragland v. Rutledge*, 234 Va. 216, 218–219, 361 S.E.2d 133 (1988), the Supreme Court stated:

> But where the plaintiff calls a defendant as an adverse witness, the plaintiff is bound by so much of the defendant's testimony as is clear, reasonable, and uncontradicted. *The plaintiff, however, is not bound by such testimony of the defendant as is in conflict with evidence introduced by the plaintiff. Weddle v. Draper*, 204 Va. 319, 322, 130 S.E.2d 462, 465 (1963); *Boyd v. Brown*, 192 Va. 702, 708, 66 S.E.2d 559, 563 (1951).
>
> In the present case, we are confronted, on the one hand, with the positive testimony of the bus driver that the bus, at all times pertinent to the accident, was wholly within its proper travel lane. We also are faced, on the other hand, with the equally firm testimony of the truck driver, called as an

adverse witness, that the truck was entirely in its proper lane of travel at all pertinent times.

The plaintiff argues, however, that reasonably to be inferred from the bus driver's testimony that the bus was in the correct lane, and from the fact that the two vehicles made contact, is the conclusion that the truck was partially in the wrong lane at the time of the accident. This inference drawn from primary facts, the argument continues, is sufficient to establish a prima facie case of negligence and causation. We do not agree.

*The plaintiff's argument disregards the effect of the truck driver's testimony as an adverse witness. As we have said, the plaintiff is bound by so much of the defendant's testimony as is uncontradicted and not in conflict with evidence introduced by the plaintiff.* The question in this case actually becomes, therefore, whether an inference may be employed to contradict positive testimony that is otherwise unrebutted. In other words, may it be inferred, from testimony that the bus was in its correct lane and from the fact of impact, that the truck was in the wrong lane, despite the clear testimony of the adverse witness that the truck was in its proper lane at contact? We hold that it may not.

Like presumptions, *inferences are never allowed to stand against ascertained and established facts. Southern Ry. v. Mays,* 192 Va. 68, 76, 63 S.E.2d 720, 725, *cert. denied,* 342 U.S. 836 (1951). *See Hall v. Commonwealth,* 178 Va. 22, 27, 16 S.E.2d 304, 305 (1941); *Schmitt v. Redd,* 151 Va. 333, 344, 143 S.E. 884, 887 (1928). Under these circumstances, an inference which the plaintiff says would impose liability upon the defendants must give way to the positive, uncontradicted evidence which exonerates the defendants from liability and demonstrates that the inference is based upon speculation and conjecture. *Virginia Transit Co. v. Schain,* 205 Va. 373, 380, 137 S.E.2d 22, 27 (1964).

In the instant case, the estate called Johnson as an adverse witness in their case, so they are bound by such of her testimony as is not contradicted by other evidence. Her testimony that the cards were all complete when Dowdy signed them is not contradicted, regardless of whom she got the cards from or when or how they were completed. Nor is her testimony that Dowdy wanted to open the bank account and

name her as the beneficiary in the event of his death and knowingly signed the account cards in her presence contradicted by any other direct evidence. Any inference from Gorton's testimony and the other circumstances, argued by the Plaintiff, "must give way to the positive, uncontradicted evidence which exonerates the defendants from liability and demonstrates that the inference [of liability] is based upon speculation and conjecture." *Virginia Transit Co. v. Schain, supra.* The Plaintiff is the one who called Johnson as an adverse witness in their case in chief, which is a tactical decision which they made, and they are bound by so much of Johnson's testimony as is clear, reasonable, and uncontradicted.

"Without evidence that a material misrepresentation of fact was knowingly made, a finding of fraud cannot be upheld. *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 214, 360 S.E.2d 828, 832 (1987)." *Thompson v. Bacon*, 245 Va. 107, 111, 425 S.E.2d 512 (1993). This was a case of the decedent's children against their father's second wife, and, while their case was very sympathetic, as the jury verdict illustrates, unfortunately, it does not pass muster when reviewed in light of the governing legal principles. Cases are to be resolved by application of the law to the facts of the case, not by the application of human sympathy and speculation. The verdict in this case was a product of sympathy and speculation, and it must be set aside.

### III. *Decision*

For the foregoing reasons, the Motions of Johnson and First Federal Savings Bank to set aside the jury's verdict for Shaffer are granted.