Present:  Carrico, C.J., Lacy, Hassell, Koontz, Kinser, and
Lemons, JJ., and Whiting, S.J. *

BARRY ELTON BLACK

v.   Record No. 010123

COMMONWEALTH OF VIRGINIA


RICHARD J. ELLIOTT

v.   Record No. 003014       OPINION BY JUSTICE DONALD W. LEMONS
                                       November 2, 2001
COMMONWEALTH OF VIRGINIA


JONATHAN O'MARA

v.   Record No. 010038

COMMONWEALTH OF VIRGINIA


               FROM THE COURT OF APPEALS OF VIRGINIA

     In these appeals, we consider whether Code § 18.2-423,

which prohibits the burning of a cross with the intent of

intimidating any person or group of persons, impermissibly

infringes upon constitutionally protected speech.  The case of

Black v. Commonwealth involves a Ku Klux Klan rally on private

property with the permission of the owner, where a cross was

burned as a part of the ceremony.  The companion cases of

O'Mara v. Commonwealth and Elliott v. Commonwealth involve the

attempted burning of a cross in the backyard of the home of

_____

     * Justice Keenan did not participate in the hearing and
decision of this case.

James S. Jubilee ("Jubilee"), an African-American, without permission. We conclude that, despite the laudable intentions of the General Assembly to combat bigotry and racism, the selectivity of its statutory proscription is facially unconstitutional because it prohibits otherwise permitted speech solely on the basis of its content, and the statute is overbroad.

FACTS AND PROCEEDINGS BELOW

The prosecutions of Richard J. Elliott ("Elliott") and Jonathan O'Mara ("O'Mara") arose from a single incident in the City of Virginia Beach. On May 2, 1998, Elliott and O'Mara attended a party at the home of David Targee ("Targee"). Elliott told several people at the party that his neighbor, Jubilee, had complained about the discharge of firearms in Elliott's backyard. In response, Elliott suggested they burn a cross in Jubilee's yard.

Elliott, O'Mara, and Targee hastily constructed a crude wooden cross in Targee's garage. While transporting the cross to the Jubilee home, Elliott referred to Jubilee with a racial epithet confirming Jubilee's race. Upon arriving at Jubilee's home, O'Mara put the cross in the ground and attempted to light it.

In addition to the epithet, the record is replete with references to Jubilee's race. In the Commonwealth's motion

2

for joinder of defendants in the Elliott and O'Mara cases, it is stated: "Mr. James Jubilee is an African-American." A fire investigator with the City of Virginia Beach testified that Targee knew the Jubilees were black before he participated in the cross burning. Throughout the O'Mara and Elliott prosecution, the Commonwealth referred to "burning a cross in a black family's yard." The questions of counsel and argument to the court are replete with references to race and racism.

Pursuant to a plea agreement, O'Mara pled guilty to attempted cross burning and conspiracy to commit cross burning, and was sentenced to 90 days in jail and a $2500 fine on each charge, with part of the time and fines suspended. Under the plea agreement, O'Mara retained the right to appeal the constitutionality of Virginia's cross burning statute.

Elliott was also charged with attempted cross burning and conspiracy to commit cross burning. Upon his plea of not guilty, a jury found him guilty of attempted cross burning, but not guilty of conspiracy. Elliott was sentenced to 90 days in jail and was fined $2500.

O'Mara and Elliott appealed to the Court of Appeals, alleging that the Virginia cross burning statute violated the free speech clauses of both the United States and Virginia Constitutions. The Court of Appeals affirmed the convictions, holding that the statute "targets only expressive conduct

undertaken with the intent to intimidate another, conduct clearly proscribable both as fighting words and a threat of violence." O'Mara v. Commonwealth, 33 Va. App. 525, 536, 535 S.E.2d 175, 181 (2000).

In the third case reviewed, Barry Elton Black ("Black") organized and led a Ku Klux Klan rally on August 22, 1998, in Carroll County. Following speeches filled with racial, ethnic, and religious bigotry, a cross approximately 25 to 30 feet tall was ignited.

Black was indicted for violating Virginia's cross burning statute. He moved for dismissal of the indictment on the grounds that the statute was unconstitutional. The trial court denied Black's motion and, upon conviction by a jury, Black was sentenced to pay a fine of $2500.

Black appealed his conviction, and the Court of Appeals affirmed the judgment of the trial court, "[f]or the reasons stated in O'Mara v. Commonwealth." Black v. Commonwealth, Rec. No. 1581-99-3, December 19, 2000, at 1.

THE CROSS BURNING STATUTE

Code § 18.2-423, the cross burning statute, provides that:

> It shall be unlawful for any person
> or persons, with the intent of
> intimidating any person or group of
> persons, to burn, or cause to be burned, a
> cross on the property of another, a

4

highway or other public place.  Any person who shall violate any provision of this section shall be guilty of a Class 6 felony.

Any such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons.

Black[1] contends that the cross burning statute is unconstitutional because it engages in viewpoint and content discrimination and it fails to incorporate the standards articulated by the United States Supreme Court in <u>Brandenburg v. Ohio</u>, 395 U.S. 444 (1969), concerning incitement to, and likelihood of, imminent lawless action.  Additionally, Black contends that the provision of the statute permitting an inference of intent to intimidate from the mere act of burning a cross, which excuses the Commonwealth from its proof requirement for the establishment of a prima facie case, further aggravates viewpoint and content discrimination and violates the limitations prescribed in <u>Brandenburg</u>.

The geometric configuration of a single vertical bar traversed by a single shorter horizontal bar has no unusual inherent properties.  But its symbolic meaning is powerful. For Christians, the symbol of the cross evokes remembrance of the crucifixion of Christ.  Unfortunately, such powerful

---

[1] Because of the similar constitutional challenges presented in these consolidated cases, our references to Black's contentions shall be inclusive of those mounted by O'Mara and Elliott.

symbols are often subject to misappropriation.  As recognized by Justice Clarence Thomas in his concurring opinion in Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 770-71 (1995), the burning of a cross has acquired a specific meaning:

> There is little doubt that the Klan's main objective is to establish a racist white government in the United States.  In Klan ceremony, the cross is a symbol of white supremacy and a tool for the intimidation and harassment of racial minorities, Catholics, Jews, Communists, and any other groups hated by the Klan. The cross is associated with the Klan not because of religious worship, but because of the Klan's practice of cross burning. . . .  The Klan simply has appropriated one of the most sacred of religious symbols as a symbol of hate.

In 1952, in direct response to Ku Klux Klan activities in Virginia,[2] including incidents of cross burning, the General Assembly enacted the predecessor statute to the law at issue

---

[2] See Police Aid Requested by Teacher: Cross is Burned in Negro's Yard, Richmond News Leader, Jan. 21, 1949, at 19; Cross Fired Near Suffolk Stirs Probe: Burning Second in Past Week, Richmond Times-Dispatch, Jan. 23, 1949, § 2, at 1; Huge Cross is Burned on Hill Just South of Covington, Richmond Times-Dispatch, Apr. 14, 1950, at 6; Cross Burned at Manakin; Third in Area, Richmond Times-Dispatch, Feb. 26, 1951, at 4; Cross is Burned at Reedville Home, Richmond News Leader, Apr. 14, 1951, at 1; 'State Might Well Consider' Restrictions on Ku Klux Klan, Governor Battle Comments, Richmond Times-Dispatch, Feb. 6, 1952, at 7; Bill to Curb KKK Passed by the House, Richmond Times-Dispatch, Mar. 8, 1952, at 5; Name Rider Approved by House: Measure Now Goes to Battle, Richmond News Leader, Feb. 23, 1952, at 1; Governor Backs Curb on Ku Klux Activities, Richmond Times-Dispatch, Feb. 10, 1952, § 2, at 1.

in these cases.[3]  The cross burning statute was amended on several occasions, including an amendment expanding the sites where cross burning may not take place, and the addition of the inference of intent to intimidate from the mere act of burning a cross for the purposes of establishing a prima facie case under the statute.[4]

SELECTIVE REGULATION OF SPEECH BASED UPON CONTENT

It is well established that non-verbal, symbolic expression is "speech," and is as fully protected by the First Amendment to the United States Constitution as more traditional means of communication.  See, e.g., Tinker v. Des Moines Indep. Sch. Dist., 393 U.S. 503 (1969) (wearing of black arm bands by high school students as a protest against the war in Vietnam).  However pernicious the expression may be, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  Texas v. Johnson, 491 U.S.

---

[3] Code §  18.1-365 stated in pertinent part:
It shall be unlawful for any person or persons to place or cause to be placed on the property of another in the Commonwealth of Virginia a burning or a flaming cross or any manner of exhibit in which a burning or flaming cross, real or simulated, is a whole or a part, without first obtaining written permission of the owner or occupier of the premises so to do.
1952 Va. Acts ch. 483 § 2 at 777.

7

397, 414 (1989).  Any question about the constitutional infirmity of such selective proscription of speech was resolved by the United States Supreme Court in the case of R.A.V. v. City of St. Paul, 505 U.S. 377 (1992).

The Virginia cross burning statute is analytically indistinguishable from the ordinance found unconstitutional in R.A.V.  R.A.V. involved the prosecution of a teenager who, with several other minors, allegedly assembled a crudely made cross and burned the cross inside the fenced yard of a black family.  Id. at 379.  The City of St. Paul prosecuted under its Bias-Motivated Crime Ordinance, which provided:

> Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.

St. Paul, Minn., Legis. Code § 292.02 (1990).  The trial court held that the statute was unconstitutional, but the Minnesota Supreme Court reversed, construing the St. Paul ordinance as limited to conduct that amounts to "fighting words," namely, "conduct that itself inflicts injury or tends to incite immediate violence . . . ."  In re Welfare of R.A.V., 464

---

[4] See 1968 Va. Acts ch. 350 at 450; 1975 Va. Acts ch. 14

N.W.2d 507, 510 (Minn. 1991).  Accepting the limited
construction placed upon the statute by the Minnesota Supreme
Court, the United States Supreme Court held that, even if the
expression reached by the ordinance was proscribable under the
"fighting words" doctrine, the ordinance was "facially
unconstitutional in that it prohibit[ed] otherwise permitted
speech solely on the basis of the subjects the speech
addresses."  R.A.V., 505 U.S. at 381.

Noting that "[t]he First Amendment generally prevents
government from proscribing speech, or even expressive
conduct, because of disapproval of the ideas expressed," the
Court observed that "[c]ontent-based regulations are
presumptively invalid."  Id. at 382 (citations omitted).
Exceptions to the rule include: obscenity (e.g., Roth v.
United States, 354 U.S. 476 (1957)), defamation (e.g.,
Beauharnais v. Illinois, 343 U.S. 250 (1952)), and "fighting
words" (e.g., Chaplinsky v. New Hampshire, 315 U.S. 568
(1942)).  But simply because particular categories of speech
may be regulated does not mean that such regulation may
selectively discriminate on the basis of content.  As the
Court in R.A.V. stated:

> And just as the power to proscribe
> particular speech on the basis of a
> noncontent element (e.g., noise) does not

at 90, ch. 15 at 174.

entail the power to proscribe the same
speech on the basis of a content element;
so also, the power to proscribe it on the
basis of one content element (e.g.,
obscenity) does not entail the power to
proscribe it on the basis of other content
elements.

R.A.V., 505 U.S. at 386.

The Commonwealth argues that the Virginia statute is

neutral because "Code § 18.2-423 applies equally to anyone who

burns a cross for the purpose of intimidating anyone."  The

Commonwealth further dwells upon the phrase in R.A.V. which

states that "threats of violence are outside the First

Amendment."  505 U.S. at 388.  This quotation is incomplete

and distorts the holding of R.A.V.  While a statute of neutral

application proscribing intimidation or threats may be

permissible, a statute punishing intimidation or threats based

only upon racial, religious, or some other selective content-

focused category of otherwise protected speech violates the

First Amendment.  Id.

Emphasizing the point, the Court in R.A.V., noted:

Thus, the government may proscribe libel;
but it may not make the further content
discrimination of proscribing only libel
critical of the government.

R.A.V., 505 U.S. at 384.

We have long held, for example, that
nonverbal expressive activity can be
banned because of the action it entails,
but not because of the ideas it expresses

10

> – so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not.

Id. at 386.

> A State might choose to prohibit only that obscenity which is the most patently offensive in its prurience – i.e., that which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive political messages.

Id. at 388.

> And the Federal Government can criminalize only those threats of violence that are directed against the President, see 18 U.S.C. § 871 – since the reasons why threats of violence are outside the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur) have special force when applied to the person of the President . . . . But the Federal Government may not criminalize only those threats against the President that mention his policy on aid to inner cities.

Id.

R.A.V. makes it abundantly clear that, while certain areas of speech and expressive conduct may be subject to proscription, regulation within these areas must not

11

discriminate based upon the content of the message.[5]  In this case, the Commonwealth seeks to proscribe expressive conduct that is intimidating in nature, but selectively chooses only cross burning because of its distinctive message.  As the Court in R.A.V. succinctly stated:  "the government may not regulate use based upon hostility – or favoritism –towards the underlying message expressed."  Id. at 386.

While not specifically stating that "race, color, creed, religion or gender" is the subject of proscription, the absence of such language in the Virginia statute does not mask

---

[5] It is important to note that R.A.V. did not interpret the First Amendment to forbid "underinclusiveness."  To the contrary, the Court held that:

> In our view, the First Amendment imposes not an "underinclusiveness" limitation but a "content discrimination" limitation upon a State's prohibition of proscribable speech.  There is no problem whatever, for example, with a State's prohibiting obscenity (and other forms of proscribable expression) only in certain media or markets, for although that prohibition would be "underinclusive," it would not discriminate on the basis of content.

Id. at 387.  Of course, the subjects of the proscription expressly stated in the St. Paul ordinance were symbols and words, including a burning cross or a Nazi swastika, evoking "anger, alarm or resentment in others on the basis of race, color, creed, religion or gender."  As the Court noted, excluded from proscription was identical behavior with a different subject, such as "political affiliation, union membership, or homosexuality."  Id. at 391.  The infirmity addressed in R.A.V., as in the cases before this Court, was

the motivating purpose behind the statutory prohibition of cross burning. The United States Supreme Court dealt with a similar question in the "flag burning" cases. In Texas v. Johnson, Johnson was prosecuted under a statute making it unlawful to intentionally or knowingly desecrate the United States flag. "Desecrate" was defined as "deface, damage, or otherwise physically mistreat in a way that the actor knows will seriously offend one or more persons likely to observe or discover his action." 491 U.S. at 400 (quoting Texas Penal Code Ann. § 42.09 (1989)). After the Supreme Court declared the Texas statute unconstitutional, Congress enacted the Flag Protection Act of 1989. In subsequent litigation concerning the Act, the government maintained that the absence of language in the Act focusing upon the content of the actor's symbolic speech cured any constitutional problems. The Supreme Court disagreed in United States v. Eichman, 496 U.S. 310, 315 (1990)(internal quotations omitted), stating that, "[a]lthough the [statute] contains no explicit content-based limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted interest is related to the suppression of free expression."

---

not "underinclusiveness;" rather, it was the selective discrimination in the ordinance based upon content.

Similarly, considering the historical and current context of cross burning, and the statute's reliance on such context for the provision of an inference of intent to intimidate from the mere act of burning a cross, it is clear that the Commonwealth's interest in enacting the cross burning statute is related to the suppression of free expression as well.

The virulent symbolism of cross burning has been discussed in so many judicial opinions that its subject and content as symbolic speech has been universally acknowledged. For example, the Supreme Court of South Carolina declared a statute[6] with operative language similar to ours unconstitutional and observed: "a burning cross historically conveys ideas capable of eliciting powerful responses from those engaging in the conduct and those receiving the message." State v. Ramsey, 430 S.E.2d 511, 514 (S.C. 1993). The Court of Appeals of Maryland also declared a statute[7] with

---

[6] S.C.CODE ANN. § 16-7-120 (1985) provided: It shall be unlawful for any person to place or cause to be placed in a public place in the State a burning or flaming cross or any manner of exhibit in which a burning or flaming cross, real or simulated, is the whole or a part or to place or cause to be placed on the property of another in the State a burning or flaming cross or any manner of exhibit in which a burning or flaming cross, real or simulated, is the whole or a part, without first obtaining written permission of the owner or occupier of the premises so to do.

[7] MD. ANN. CODE art.27, § 10A (1957, 1992 Repl. Vol.) provided in pertinent part:

operative language similar to ours unconstitutional and

observed:

> Those who openly burn crosses do so fully cognizant of the controversial racial and religious messages which such acts impart. Historically, the Ku Klux Klan burned crosses to express hostility towards blacks and other groups it disfavored, and it is that idea which contemporary cross burners aim to perpetuate.

State v. Sheldon, 629 A.2d 753, 757 (Md. 1993).

The historical context for the passage of the Virginia cross burning statute is uncontrovertible. In an atmosphere of racial, ethnic, and religious intolerance, the General Assembly acted to combat a particular form of intimidating symbolic speech – the burning of a cross. It did not proscribe the burning of a circle or a square because no animating message is contained in such an act.

Initially, the cross burning proscription extended only to acts on property of another without permission. In 1968, the limitation concerning situs was removed, and in 1975, the addition of language establishing prima facie evidence of intent to intimidate from the mere act of burning a cross reaffirmed the legislative context of the statute. During

---

It shall be unlawful for any person or persons to burn or cause to be burned any cross or other religious symbol upon any private or public property within this State without the express consent of the owner of such property and without

15

oral argument, the Commonwealth maintained that the portion of the statute proscribing the burning of a cross had nothing to do with the motivation of the actor.  When asked how the Commonwealth could justify the inference of intimidation provided in the last sentence of the statute, the Commonwealth relied upon the historical context of cross burning.  The Commonwealth cannot have it both ways.

"SECONDARY EFFECTS"

As described above, the R.A.V. analysis begins with categories of speech that may be subject to regulation and holds that such regulation may not selectively discriminate on the basis of content.  However, the Court in R.A.V. recognized that some selective regulation of constitutionally protected speech may be permissible if it is based upon the "secondary effects" of speech rather than its content.  See Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986).  In Renton, the ordinance under review proscribed the location of an adult motion picture theater within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school.  Because the ordinance did not ban adult theaters entirely, the Court held that the ordinance is "properly

---

first giving notice to the fire department which services the area in which such burning is to take place.

16

analyzed as a form of time, place, and manner regulation." Id. at 46.

The analysis used by the Court focused upon whether the regulation was directed at the content of the protected speech or at a legitimate area of government concern. Determining that the dominant motive of the ordinance was "to prevent crime, protect the city's retail trade, maintain property values, and generally 'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life,' the Court upheld the ordinance. Id. at 48. The Court held that the regulation in Renton was "aimed not at the content of the films shown at 'adult motion picture theatres,' but rather at the secondary effects of such theaters on the surrounding community." Id. at 47. By contrast, the legislative history of the Virginia cross burning statute, the meaning afforded the expressive conduct, and the provision of prima facia evidence of intent to intimidate from the mere act of burning a cross, make it abundantly clear that Code § 18.2-423 is aimed at regulating content, not "secondary effects."

OVERBREADTH ANALYSIS

As discussed herein, the majority opinion in R.A.V. holds that certain categories of speech may be regulated, but the government may not discriminate in its proscription within

17

these categories on the basis of content.  The concurring opinions in R.A.V. preferred a more traditional analysis confined to the question whether the ordinance suffered from overbreadth.  As Justice White noted, St. Paul's ordinance was unconstitutionally overbroad because:

> Although the ordinance as construed reaches categories of speech that are constitutionally unprotected, it also criminalizes a substantial amount of expression that -- however repugnant -- is shielded by the First Amendment.

Id. at 413 (J. White, concurring).  The Commonwealth's cross burning statute is similarly defective.

It is not simply the prospect of conviction under the statute that renders it overbroad.  The enhanced probability of prosecution under the statute chills the expression of protected speech sufficiently to render the statute overbroad. Virginia v. American Booksellers Ass'n, 484 U.S. 383, 392-93 (1988).  Threat of prosecution under a criminal statute "tends to chill the exercise of First Amendment rights."  North Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705, 710 (4th Cir. 1999).  Self-censorship, "a harm that can be realized even without an active prosecution," inhibits free speech.  Vermont Right to Life Committee, Inc. v. Sorrell, 221 F.3d 376, 382 (2nd Cir. 2000).

18

Code § 18.2-423 provides in part that "any such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons." Assuming that the act is done "on the property of another, a highway or other public place,"[8] the act of burning a cross alone, with no evidence of intent to intimidate, will nonetheless suffice for arrest and prosecution and will insulate the Commonwealth from a motion to strike the evidence at the end of its case-in-chief. That the trier of fact ultimately finds the actor not guilty of the offense is little consolation after arrest and prosecution for speech or expressive conduct that is otherwise protected. Arrest for, and prosecution of, otherwise protected speech, with no evidence of a critical element of the offense other than a statutorily supplied inference, chills free expression. Code § 18.2-423 sweeps within its ambit for arrest and prosecution, both protected and unprotected speech. As such it is overbroad.

BRANDENBURG ISSUES

In R.A.V., the Court acknowledged that the narrow construction placed upon the ordinance limited its application to "fighting words," a proper category of proscription.

---

[8] The Virginia statute prohibits cross-burning "on the property of another, a highway or other public place." Remarkably, it sweeps within its prohibition the act "on the property of another" with or without permission.

Nonetheless, the ordinance was declared unconstitutional because of its selective application to only certain expressions of fighting words. Virginia's cross burning statute suffers from the same infirmity. Because we hold that the statute impermissibly proscribes otherwise protected speech on the basis of content, and because the statute is overbroad, it is unnecessary to address the remaining challenges under Brandenburg.[9]

CONCLUSION

Under our system of government, people have the right to use symbols to communicate. They may patriotically wave the flag or burn it in protest; they may reverently worship the cross or burn it as an expression of bigotry. Neutrally expressed statutes prohibiting vandalism, assault, and trespass may have vitality for the prosecution of particularly offensive conduct. While reasonable prohibitions upon time, place, and manner of speech, and statutes of neutral application may be enforced, government may not regulate speech based on hostility –or favoritism –towards the underlying message expressed.

_____

[9] Additionally, because we resolve these questions under the First Amendment to the United States Constitution, it is unnecessary to address Elliott's and O'Mara's additional argument that Article I, § 12 of the Virginia Constitution is also violated.

20

A statute selectively addressed to the content of symbolic speech is not permitted under the First Amendment. Additionally, a statute that sweeps within its ambit both protected and unprotected speech is overbroad. Accordingly, we hold that Code § 18.2-423 violates the First Amendment of the United States Constitution. The convictions in each of these appeals will be vacated and the indictments will be dismissed.

                                        Reversed and dismissed.

JUSTICE KINSER, with whom SENIOR JUSTICE WHITING joins, concurring.

In the words of the dissent, I, too, "stand second to none in my devotion to the First Amendment's mandate that most forms of speech are protected, irrespective of how repugnant and offensive the message uttered or conveyed may be to others." However, in contrast to the dissent, I cannot be dissuaded from that devotion, and believe that the "fair application of our jurisprudence" must include a fair and proper application of the First Amendment. Therefore, I fully agree with the majority opinion. I write separately to address certain inferences and conclusions drawn by the dissent.

Relying on the definition of the term "intimidation" set forth in Sutton v. Commonwealth, 228 Va. 654, 663, 324 S.E.2d

665, 670 (1985) ("intimidation . . . means putting a victim in fear of bodily harm"), the dissent concludes that Code § 18.2-423 proscribes only conduct that constitutes "true threats." Expanding on that definition, the dissent then states that the purpose of Code § 18.2-423 is "to proscribe physical acts intended to inflict bodily harm upon the victims of such acts." The dissent's attempt to equate an intent to intimidate with a "true threat" or a physical act intended to inflict bodily harm has no legal basis and misconstrues the decision in Sutton.

The issue in that case was whether there was sufficient evidence to prove that the defendant engaged in sexual intercourse with the victim against her will by intimidation. 228 Va. at 662, 324 S.E.2d at 669. Noting that the General Assembly had expanded the scope of the statute proscribing rape to include "a prohibition against sexual intercourse with a woman against her will by threat or intimidation," as well as by force, the Court explained that "[t]here is a difference between threat and intimidation[,]" and that "[i]ntimidation may occur without threats." Id. at 663, 324 S.E.2d at 669-70. Thus, our established jurisprudence does not support the proposition that Code § 18.2-423 proscribes only conduct that constitutes "true threats." An act performed with the intent to intimidate, i.e., to place an individual in fear of bodily

22

harm, does not rise to the same level as a threat (defined in Sutton as "expression of an intention to do bodily harm," 228 Va. at 663, 324 S.E.2d at 670), or a physical act intended to inflict bodily harm.

For the same reason, Code § 18.2-423 does not satisfy the principle enunciated in Brandenburg v. Ohio, 395 U.S. 444, 447 (1969), that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Although reprehensible and offensive, the act of burning a cross with the intent to intimidate is not necessarily speech aimed at "producing imminent lawless action." Id. That proposition is borne out by the fact that the cross burning for which Barry Elton Black was convicted occurred on private property with the permission of the owner.

Even if the dissent were correct that Code § 18.2-423 proscribes only conduct that constitutes "true threats," the General Assembly cannot engage in content discrimination by selectively prohibiting only those "true threats" that convey a particular message. R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992). Unfortunately, that is what the General Assembly has done in Code § 18.2-423 by confining the

23

proscription in that statute to the act of burning a cross. The constitutional infirmity is not, as suggested by the dissent, cured by the fact that the statute does not prohibit all acts of burning a cross. The statute's content-based discrimination still exists.

Finally, the dissent's statement that the majority has concluded that the Constitution of the United States prevents the General Assembly from enacting a statute that prohibits persons from burning a cross "in a manner that intentionally places citizens in fear of bodily harm" misinterprets the holding in the majority opinion. I believe that a more accurate characterization of the majority's conclusion is that the General Assembly may, in a statute of neutral application, proscribe expressive conduct performed with the intent to intimidate another individual, but that the General Assembly may not selectively prohibit only certain acts of intimidation based upon the content of the underlying message.

For these reasons, I respectfully concur.

JUSTICE HASSELL, with whom CHIEF JUSTICE CARRICO and JUSTICE KOONTZ join, dissenting.

I dissent. The majority opinion invalidates a statute that for almost 50 years has protected our citizens from being placed in fear of bodily harm by the burning of a cross. The majority concludes that the Constitution of the United States

24

prohibits the General Assembly from enacting this statute.  I find no such prohibition in either the Constitution of Virginia or the Constitution of the United States.  Without question, the framers of the First Amendment never contemplated that a court would construe that Amendment so that it would permit a person to burn a cross in a manner that intentionally places citizens in fear of bodily harm.

I am concerned about the fair application of our jurisprudence to every citizen and the proper interpretation of our Federal and State Constitutions.  These same concerns for fairness and the safety of our citizens were the very basis for the General Assembly's decision to enact Code § 18.2-423 almost 50 years ago.

I stand second to none in my devotion to the First Amendment's mandate that most forms of speech are protected, irrespective of how repugnant and offensive the message uttered or conveyed may be to others.  However, contrary to the view adopted by the majority in these appeals, the First Amendment does not permit a person to burn a cross in a manner that intentionally places another person in fear of bodily harm.

I.

A.

25

Barry Elton Black was indicted by a Carroll County grand jury for the burning of a cross with the intent to intimidate in violation of Code § 18.2-423. At the conclusion of a trial, the jury found him guilty as charged in the indictment and fixed his punishment at $2,500. Black appealed the circuit court's judgment confirming the jury's verdict to the Court of Appeals, which affirmed his conviction. Black v. Commonwealth, Record No. 1581-99-3 (December 19, 2000).

The following evidence was presented during Black's trial. On August 22, 1998, H. Warren Manning, the Sheriff of Carroll County, received a report that members of the Ku Klux Klan intended to conduct a rally in Carroll County that evening. Later, Sheriff Manning drove his police car to the site of the rally, where three men dressed in white robes and hats approached him. Sergeant Richard C. Clark, Jr., met Sheriff Manning at the site of the rally.

Approximately 45 minutes later, after the rally started, Sheriff Manning observed the Klan members burn a cross that was approximately 25 to 30 feet tall. Sheriff Manning approached Black and inquired, "who [is] responsible for burning the cross?" Black responded that he was responsible for burning the cross, and he was placed under arrest.

26

The rally was conducted on property owned by Annabell Sechrist. She was present during the rally, and she had given the Ku Klux Klan permission to burn the cross on her property.

Rebecca Sechrist, a Caucasian female, lived on property adjacent to the property where the rally occurred. Sechrist observed the rally from her home. In response to the question, "[w]hat statements did you hear?", she testified: "They . . . talked a lot about blacks - and I don't call [ ] the word they called it . . . it started with an N and I don't, I don't use that word, I'm sorry – but they talked real bad about the blacks and the Mexicans and they talked about how, one . . . guy got up and said that he would love to take a .30/.30 and just random shoot the blacks and talked about how they would like to send the blacks and the Mexicans back from where they come from and talked about President Clinton and Hillary Clinton and about the government funding money for the, for the people that can't afford housing and stuff and . . . how their tax paying goes to keep the black people up and stuff like that."

Sechrist testified that she was "scared" as a result of the rally. She stated: "I was scared our home would get burned or something would happen to it. We've got two . . . kids and I was afraid that something would happen to them."

27

In response to a question by defendant's counsel, Sechrist testified:  "I think they were trying to scare me."

B.

Jonathan Stephen O'Mara was indicted by a grand jury in the City of Virginia Beach for attempting to burn a cross with the intent of intimidating a person or group of persons in violation of Code § 18.2-423 and conspiracy to burn a cross in violation of Code § 18.2-423.  O'Mara entered a guilty plea that reserved his right to file an appeal challenging the constitutionality of Code § 18.2-423.

The court fixed O'Mara's punishment at incarceration in the jail for a term of 90 days and imposed a fine of $2,500 on each of the charges.  O'Mara appealed the judgment to the Court of Appeals, which affirmed his convictions.  O'Mara v. Commonwealth, 33 Va. App. 525, 535 S.E.2d 175 (2000).

O'Mara entered into a stipulation of facts with the Commonwealth, which was made a part of the record in the circuit court.  The stipulation states:  "On May 2, 1998, David Targee had approximately fifteen individuals, including Jonathan O'Mara and Richard Elliott, at his residence in Virginia Beach.  They were all consuming alcohol.  Elliott complained to Targee and O'Mara about his neighbor and about how he wanted to 'get back' at him.  It was suggested (not by O'Mara) that they burn a cross in Elliott's neighbor's yard.

28

O'Mara and Targee agreed, and they all went to Targee's garage where a cross was built. They all got in Targee's truck and drove to Munden Point Road in Virginia Beach. Targee was driving, with O'Mara in the front passenger seat and Elliott in the back seat. Once there, Elliott handed the cross to O'Mara, who also grabbed a can of lighter fluid and went outside and placed the cross in the yard of Elliott's neighbor. He then poured lighter fluid on the cross, set it on fire, and ran back to the car. Targee drove them back to his house. The next morning, Elliott's neighbor, James Jubilee, came out of his house and observed the partially burned cross in his yard. He broke the cross and placed [it] in the garage. He later called the police."

C.

A grand jury in the City of Virginia Beach indicted Richard J. Elliott for attempting to burn a cross on the property of James S. Jubilee with the intent of intimidating any person or group of persons in violation of Code § 18.2-423 and conspiracy to burn a cross in violation of Code § 18.2-423. At the conclusion of a trial, the jury found Elliott guilty of attempted cross burning with the intent to intimidate and fixed his punishment at 90 days incarceration in jail and a fine of $2,500. Elliott appealed the circuit

29

court's judgment to the Court of Appeals, which affirmed his conviction.  See O'Mara, 33 Va. App. 525, 535 S.E.2d 175.

The following evidence was adduced at the trial.  James Jubilee resided at 2044 Munden Point Road in Virginia Beach. One day, Mr. Jubilee told his next door neighbor, Mrs. Elliott, that he was concerned because persons were discharging firearms in her backyard.  Mrs. Elliott responded that her husband maintained a firing range in the rear of her yard.

On May 2, 1998, David Targee had a party at his home where he entertained Jonathan O'Mara, Richard Elliott, and others.  Richard Elliott, who had consumed alcoholic beverages, mentioned that "his neighbors were complaining about him shooting in his backyard . . . .  He wanted to get back at them for doing it."

Later that evening, Targee, Elliott, and O'Mara went to Targee's parents' garage and constructed a wooden cross. After they had constructed the cross, they traveled by car to Mr. Jubilee's home where O'Mara placed the cross in the yard and ignited it.  The next morning between 8:15 and 8:30, Mr. Jubilee saw the cross, which contained "burn spots."  He picked it up and broke it.

Jennifer Luning, O'Mara's former "girlfriend," testified that O'Mara admitted that he, Targee, and Richard Elliott had

burned the cross. "He had said that before they actually went out and did it that there was a conversation taking place about Richard had been complaining or the neighbors had been complaining about shooting [guns] in the backyard."

Edwin Coyner, a fire investigator for the City of Virginia Beach, testified that he interviewed Targee several times. Targee informed Coyner that "Richard Elliott had complained about his neighbors because the neighbors had complained about him shooting in the backyard."

II.

A.

The First Amendment of the Constitution of the United States provides in part: "Congress shall make no law . . . abridging the freedom of speech." Article I, § 12 of the Constitution of Virginia states:

> "That the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of the people peaceably to assemble, and to petition the government for the redress of grievances."

The Fourteenth Amendment prohibits state action in violation of the First Amendment. The freedom of speech guaranteed by Article I, § 12 of the Constitution of Virginia

31

is co-extensive with the protections guaranteed by the First

Amendment of the Constitution of the United States.

Code § 18.2-423 states:

"It shall be unlawful for any person or persons, with the intent of intimidating any person or group of persons, to burn, or cause to be burned, a cross on the property of another, a highway or other public place.  Any person who shall violate any provision of this section shall be guilty of a Class 6 felony.
"Any such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons."

B.

We have held, since the birth of this Commonwealth, that

"the judiciary may and ought to adjudge a law unconstitutional

and void, if it be plainly repugnant to the letter of the

Constitution, or the fundamental principles thereof."  Kamper

v. Hawkins, 3 Va. (1 Va. Cas.) 20, 40 (1793).  However,

clearly engrained within our jurisprudence is the principle

that this Court

"can declare an act of the general assembly void only when such act clearly and plainly violates the [C]onstitution, and in such manner as to leave no doubt or hesitation on our minds.
"This rule has been repeatedly declared by this court.

. . . .

The presumption always is that the legislature has judged correctly of its constitutional powers, and the contrary must be clearly demonstrated before a co-ordinate branch of the government can be called

32

upon to interfere between the people and their immediate representatives."

Commonwealth v. Moore, 66 Va. (25 Gratt.) 951, 953 (1875).

Indeed, we have repeatedly held that "[e]very act of the legislature is presumed to be constitutional, and the courts are powerless to declare an act invalid, except where it appears beyond doubt that it contravenes some provision of the State or Federal Constitution. If we doubt we must sustain its constitutionality." Tobacco Growers Co-Operative Assoc. v. Danville Warehouse Co., 144 Va. 456, 469, 132 S.E. 482, 486 (1926). We restated this fundamental principle in Harrison v. Day, 200 Va. 764, 770, 107 S.E.2d 594, 598 (1959):

> "When the constitutionality of an act is challenged, a heavy burden of proof is thrust upon the party making the challenge. All laws are presumed to be constitutional and this presumption is one of the strongest known to the law. As we said in Almond v. Day, 199 Va. 1, 6, 97 S.E.2d 824[, 828 (1957)]: '. . . It is only where an act is plainly repugnant to some constitutional provision that the courts can declare it null and void. If there be a reasonable doubt whether the act violates the fundamental law, that doubt must be resolved in favor of the act.' "

Accord Jefferson Green Unit Owners Assoc., Inc. v. Gwinn, 262 Va. 449, 459, 551 S.E.2d 339, 344 (2001); Motley v. Virginia State Bar, 260 Va. 243, 247, 536 S.E.2d 97, 99 (2000); Finn v. Virginia Retirement System, 259 Va. 144, 153, 524 S.E.2d 125, 130 (2000); Pulliam v. Coastal Emergency Services, 257 Va. 1, 9, 509 S.E.2d 307, 311 (1999); Mumpower v. Housing Authority,

176 Va. 426, 443, 11 S.E.2d 732, 738 (1940); <u>Antoni</u> v. <u>Wright</u>, 63 Va. (22 Gratt.) 833, 882 (1872); <u>Auditor of Public Accounts</u> v. <u>Graham</u>, 5 Va. (1 Call) 475, 476 (1798).  For some inexplicable reason, the majority ignores this fundamental principle.

C.

Black, O'Mara, and Elliott (the defendants), relying principally upon <u>R.A.V.</u> v. <u>City of St. Paul</u>, 505 U.S. 377 (1992), argue that Code § 18.2-423 violates their right to freedom of speech guaranteed by the First Amendment to the Constitution of the United States and Article I, § 12 of the Constitution of Virginia and that the Court of Appeals erred by holding that the statute comported with these constitutional provisions.  I disagree with the defendants.

Initially, I observe that Code § 18.2-423, by its express terms, does not proscribe every act of burning a cross. Rather, Code § 18.2-423 only proscribes the act of burning a cross when such act is performed "with the intent of intimidating any person or group of persons" and the act is committed "on the property of another, a highway or other public place."  In the context of our criminal statutes, specifically Code § 18.2-61, we have defined intimidation as acts which put the victim "in fear of bodily harm.  Such fear must arise from the willful conduct of the accused, rather

34

than from some mere temperamental timidity of the victim; however, the fear of the victim need not be so great as to result in terror, panic, or hysteria."  Sutton v. Commonwealth, 228 Va. 654, 663, 324 S.E.2d 665, 669 (1985).

Thus, applying the clear and unambiguous language in Code § 18.2-423 in conjunction with our established definition of intimidation, which the majority ignores, I conclude that Code § 18.2-423 only proscribes conduct which constitutes "true threats."  And, I note that the United States Supreme Court, in Watts v. United States, 394 U.S. 705, 707 (1969), approved the facial constitutionality of a federal criminal statute that prohibited someone from threatening the life of the President of the United States.  It is well established that true threats of violence can be proscribed by statute without infringing upon the First Amendment. Madsen v. Women's Health Center, Inc., 512 U.S. 753, 774 (1994); Nat'l Organization for Women, Inc. v. Scheidler, ___ F.3d ___, ___ (7th Cir. 2001); Bauer v. Sampson, 261 F.3d 775, 782 (9th Cir. 2001); United States v. Rahman, 189 F.3d 88, 115 (2nd Cir.), cert. denied, sub nom. Nosair v. United States, 528 U.S. 982 (1999); United States v. Francis, 164 F.3d 120, 122-23 (2nd Cir. 1999); United States v. J.H.H., 22 F.3d 821, 825 (8th Cir. 1994).  However, I must continue this inquiry regarding the constitutionality of Code § 18.2-423 because in

35

R.A.V., supra, the Supreme Court held that the First Amendment imposes certain limitations upon the regulation of speech and expressive conduct, including true threats.

In R.A.V., the Supreme Court considered whether an ordinance was facially invalid under the First Amendment. In R.A.V., the defendant, along with several other teenagers, made a wooden cross and burned it in a yard owned by a black family. The defendant was convicted of violating the following ordinance:

> "Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor."

The Supreme Court held that the ordinance was facially unconstitutional because it prohibited otherwise permitted speech solely on the basis of the content of the speech, even though the Minnesota Supreme Court had concluded that the ordinance only prohibited unprotected "fighting words." R.A.V., 505 U.S. at 379-81.

The Supreme Court observed, however, that certain "areas of speech can, consistently with the First Amendment, be regulated because of their constitutionally proscribable content (obscenity, defamation, etc.) – not that they are

36

categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content.  Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing only libel critical of the government."  Id. at 383-84.

The Supreme Court explained:

"When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists.  Such a reason, having been adjudged neutral enough to support exclusion of the entire class of speech from First Amendment protection, is also neutral enough to form the basis of distinction within the class.  To illustrate:  a State might choose to prohibit only that obscenity which is the most patently offensive in its prurience – i.e., that which involves the most lascivious displays of sexual activity.  But it may not prohibit, for example, only that obscenity which includes offensive political messages.  See Kucharek v. Hanaway, 902 F.2d 513, 517 (7th Cir. 1990), cert. denied, 498 U.S. 1041 (1991).  And the Federal Government can criminalize only those threats of violence that are directed against the President, see 18 U.S.C. § 871 – since the reasons why threats of violence are outside the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur) have special force when applied to the person of the President.  See Watts v. United States, 394 U.S. 705, 707 (1969). . . .  But the Federal Government may not criminalize only those threats against the President that mention his policy on aid to inner cities.  And to take a final example . . . a State may choose to regulate price advertising in one industry, but not in others, because the risk of fraud . . . is in its view greater there. . . .  But

37

a State may not prohibit only that commercial advertising that depicts men in a demeaning fashion."

R.A.V., 505 U.S. at 388-89.

The Supreme Court also articulated a second basis which would permit some degree of content-based discrimination.

"Another valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associated with particular 'secondary effects' of the speech, so that the regulation is 'justified without reference to the content of the . . . speech.'  Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48 (1986) . . . .  A State could, for example, permit all obscene live performances except those involving minors.  Moreover, since words can in some circumstances violate laws directed not against speech, but against conduct . . . a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct, rather than speech. . . .  Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.
"These bases for distinction refute the proposition that the selectivity of the restriction is 'even arguably "conditioned upon the sovereign's agreement with what a speaker may intend to say." ' Metromedia, Inc. v. San Diego, 453 U.S. 490, 555 (1981) . . . .  There may be other such bases as well.  Indeed, to validate such selectivity (where totally proscribable speech is at issue), it may not even be necessary to identify any particular 'neutral' basis, so long as the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot. . . .  Save for that limitation, the regulation of 'fighting words,' like the regulation of noisy speech, may address some offensive instances and leave other, equally offensive, instances alone."

R.A.V., 505 U.S. at 389-90.

In invalidating the City of St. Paul's ordinance, the Supreme Court stated that

> "[a]lthough the phrase in the ordinance 'arouses anger, alarm or resentment in others,' has been limited by the Minnesota Supreme Court's construction to reach only those symbols or displays that amount to 'fighting words,' the remaining, unmodified terms make clear that the ordinance applies only to 'fighting words' that insult, or provoke violence, 'on the basis of race, color, creed, religion or gender.' Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics. Those who wish to use 'fighting words' in connection with other ideas – to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality – are not covered. The First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects."

Id. at 391.

Continuing, the Supreme Court explained:

> "What we have here, it must be emphasized, is not a prohibition of fighting words that are directed at certain persons or groups (which would be facially valid if it met the requirements of the Equal Protection Clause); but rather, a prohibition of fighting words that contain . . . messages of 'bias-motivated' hatred and, in particular, as applied to this case, messages 'based on virulent notions of racial supremacy.' "

Id. at 392 (citation omitted).

Contrary to the majority's opinion, Code § 18.2-423 does not suffer from the defects contained in the ordinance at

issue in R.A.V. As previously stated, Code § 18.2-423 does not prohibit every act of burning of a cross. Rather, the statute only prohibits the burning of a cross when such act is performed with the intent to intimidate. And, consistent with our jurisprudence, the word "intimidate" means to place one in fear of bodily harm. Unlike the City of St. Paul's ordinance, which targeted cross burning on the basis of race, color, creed, religion or gender, Code § 18.2-423 does not contain those limitations. The conduct proscribed in the Virginia statute applies to any individual who burns a cross for any reason provided the cross is burned with the intent to intimidate. That point is best illustrated in O'Mara and Elliott because these defendants burned a cross because they were angry that their neighbor had complained about the presence of a firearm shooting range in the Elliotts' yard, not because of any racial animus.

Additionally, the Supreme Court pointed out in R.A.V. that a valid basis for according differential treatment even to a content-defined subclass of proscribable speech is when the subclass happens to be associated with particular secondary effects of the speech so that the regulation is justified without reference to the content of the speech. The ordinance that the Supreme Court invalidated in R.A.V. targeted any cross burning that "one knows or has reasonable

grounds to know arouses anger, alarm or resentment."  505 U.S. at 380.

By contrast, from its clear and unambiguous language, the purpose of the Virginia statute, Code § 18.2-423, is not to suppress repugnant ideas, but rather to proscribe physical acts intended to inflict bodily harm upon the victims of such acts.  Simply stated, the Virginia statute proscribes acts of intimidation, but it does not prohibit persons from expressing their views, irrespective of how repugnant or offensive those views may be to others.  The Virginia statute does not prohibit the burning of a cross so long as that act is committed without an intent to place a person in fear of bodily harm.  See also In re Steven S., 31 Cal. Rptr. 2d 644, 646, 647-48 (Cal. Ct. App. 1994) (statute proscribing the act of "burn[ing] a cross on the private property of another for the purpose of terrorizing the owner or occupant or in reckless disregard of that risk" is not impermissible content-based prohibition on speech within the meaning of the First Amendment); State v. Talley, 858 P.2d 217, 220, 225-27 (Wash. 1993) (statute proscribing cross burning that places another person in reasonable fear of harm to his person or property does not violate the First Amendment).

I recognize that the Supreme Court of South Carolina, in State v. Ramsey, 430 S.E.2d 511 (S.C. 1993), invalidated a

41

statute that prohibited the burning of a cross on the basis that it contravened the First Amendment. The South Carolina statute, however, was significantly different from the Virginia statute. The South Carolina statute stated: "It shall be unlawful for any person to place or cause to be placed in a public place in the State a burning or flaming cross or any manner of exhibit in which a burning or flaming cross, real or simulated, is the whole or a part . . . without first obtaining written permission of the owner or occupier of the premises so to do." Id. at 514.

Unlike Code § 18.2-423, which proscribes the burning of a cross with the intent of intimidating and, thus, prohibits real threats, the South Carolina statute contained no similar limitation. The Supreme Court of South Carolina concluded that its statute was enacted "in order to protect individuals and society as a whole from the reprehensible messages often sought to be symbolicly expressed by a burning cross." Ramsey, 430 S.E.2d at 514. As I have already explained, Virginia's statute does not suffer from this constitutional defect. Thus, the differences between the Virginia statute and the South Carolina statute are real and significant. Yet, the majority ignores the differences between Code § 18.2-423 and the South Carolina statute.

42

I also observe that the Maryland Court of Appeals, in State v. Sheldon, 629 A.2d 753, 755 (Md. 1993), held that a Maryland statute violated the First Amendment because it required those who wished to burn crosses or religious symbols to "secure the permission of the property owner where the burning is to occur and [to] notify the local fire department before engaging in the burning."  That statute stated in part:

> "It shall be unlawful for any person or persons to burn or cause to be burned any cross or other religious symbol upon any private or public property within this State without the express consent of the owner of such property and without first giving notice to the fire department which services the area in which such burning is to take place."

Id. at 755.  Unlike the Virginia statute, the Maryland statute did not proscribe burning a cross with the intent of intimidating, but rather, is content-based regulation of expression.  The Maryland Supreme Court found "no way to justify the cross burning statute without referring to the substance of speech it regulates, because the statute does not protect property owners or the community from unwanted fires any more than the law already protected those groups before the statute's enactment."  Id. at 755.  Yet, the majority ignores these significant distinctions.

### III.

Defendant Black argues that Code § 18.2-423 "does not incorporate the requirements that the speech at issue be

43

directed to the incitement of imminent lawless action, and likely to produce such action, and as such is unconstitutional under the standard of Brandenburg v. Ohio, and the Brandenburg standard was not satisfied here."  I disagree with the defendant.  The Supreme Court's decision in Brandenburg v. Ohio, 395 U.S. 444 (1969) simply has no application here.

The Supreme Court considered the following facts in Brandenburg.  Brandenburg, "a leader of a Ku Klux Klan group, was convicted under the Ohio Criminal Syndicalism statute for 'advocat[ing] . . . the duty, necessity, or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform' and for 'voluntarily assembl[ing] with any society, group, or assemblage of persons formed to teach or advocate the doctrines of criminal syndicalism.' "  Id. at 444-45 (alteration in original).

Brandenburg placed a telephone call to a reporter on the staff of a television station and invited the reporter to attend a Ku Klux Klan rally that would be held at a certain farm.  "[T]he reporter and a cameraman attended the meeting and filmed the events.  Portions of the films were later broadcast on the local station and on a national network." Id. at 445.  The prosecutor relied upon the films and testimony identifying the defendant as the person who

communicated with the reporter and who spoke at the rally. The prosecutor "also introduced into evidence several articles appearing in the film, including a pistol, a rifle, a shotgun, ammunition, a Bible, and a red hood worn by the speaker in the films." The only persons present at the rally other than the participants were the newsmen who made the film. Id. at 445-46.

The Supreme Court pointed out that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Id. at 447. Continuing, the U.S. Supreme Court stated that

> "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action. . . . A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control."

Id. at 448.

The Supreme Court invalidated the Ohio Criminal Syndicalism Act because neither the indictment nor the trial court's instructions to the jury "refined the statute's bald

45

definition of the crime in terms of mere advocacy not distinguished from incitement to imminent lawless action." Id. at 448-49.

In stark contrast to the Supreme Court's decision in Brandenburg, we are not concerned here with abstract teaching regarding the moral propriety or even moral necessity of violence as a means for accomplishing political reform. Rather, the subject of this case is Code § 18.2-423, a statute which proscribes the burning of a cross with the intent to intimidate, which we have held means to place the victim in fear of bodily harm. And, I note that the jury at defendant Black's trial was specifically instructed that

> "[i]ntimidate, as used in the term 'with the intent to intimidate' means a motivation to intentionally put a person or group of persons in fear of bodily harm. Such fear must arise from the willful conduct of the accused, rather than from some mere temperamental timidity of the victim; however, the fear of the victim need not be so great as to result in terror, panic, or hysteria."

I have already observed, in response to defendant's counsel's questions at trial, Rebecca Sechrist testified that she was afraid that her "home would get burned or something would happen to it." Moreover, defendant Black has never challenged the sufficiency of the evidence to support the jury's finding beyond a reasonable doubt that his acts placed Sechrist in fear of bodily harm.

46

IV.

Defendant Black argues that "[t]he provision of Code § 18.2-423 providing that the burning of a cross shall be prima facie evidence of an intent to intimidate permits a jury to find intimidation from the mere act of cross-burning alone, in contravention of the First Amendment."  I disagree.

Code § 18.2-423 creates a statutory inference, and we have stated that an "inference merely applies to the rational potency or probative value of an evidentiary fact to which the fact finder may attach whatever force or weight it deems best."  Martin v. Phillips, 235 Va. 523, 526 n.1, 369 S.E.2d 397, 399 n.1 (1988).  Additionally, "inferences are never allowed to stand against ascertained and established facts."  Ragland v. Rutledge, 234 Va. 216, 219, 361 S.E.2d 133, 135 (1987) (citing Southern Ry. v. Mays, 192 Va. 68, 76, 63 S.E.2d 720, 725, cert. denied, 342 U.S. 836 (1951)).

This statutory inference is a factor that the jury may accept or reject in determining whether a defendant burned a cross with the intent to intimidate a victim.  This inference alone, however, is clearly insufficient to establish beyond a reasonable doubt that a defendant burned a cross with the intent to intimidate.  And, this statutory inference does not, and cannot, absolve the Commonwealth of its burden to prove each element of Code § 18.2-423 beyond a reasonable doubt.

47

Moreover, the jury in Black's trial was specifically instructed as follows:

"INSTRUCTION NO. 6

"THE COURT INSTRUCTS THE JURY THAT:

"The burden is upon the Commonwealth to prove by the evidence beyond a reasonable doubt every material and necessary element of the offense charged.  It is not sufficient that the jury believe the defendant's guilt probable, or more probable than his innocence.  Suspicion or probability of guilt, however strong, will not authorize a conviction.  The evidence must prove his guilt beyond a reasonable doubt.  The jury shall not speculate or go outside the evidence to consider what they think might have taken place, but you are to confine your consideration to the evidence introduced by the Commonwealth and the defense and unless you believe that the guilt of Barry Elton Black has been proved beyond a reasonable doubt as to every material and necessary element of the offense charged against him, then you shall find him not guilty."

. . . .

"INSTRUCTION NO. 8

"THE COURT INSTRUCTS THE JURY THAT:

"The defendant is charged with the crime of placing a burning cross in a public place with the intent to intimidate.  The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
"(1) That the defendant burned or caused to be burned a cross in a public place; and
"(2) That he did so with the intent to intimidate any person or group of persons.
"If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the offense as charged, then you shall find the defendant guilty,

48

but you shall not fix the punishment until your verdict has been returned and further evidence has been heard by you.

"If you find that the Commonwealth has failed to prove beyond a reasonable doubt either or both of the elements of the offense, then you shall find the defendant not guilty."

As these jury instructions indicate, the Commonwealth was required to prove each and every element of its case, including the requirement of intimidation, beyond a reasonable doubt.

V.

For the foregoing reasons, I would affirm the judgments of the Court of Appeals.

49